## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| SANDRA E. MONTANEZ,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:22-cv-00150<br><br>JUDGE BENITA Y. PEARSON<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Sandra E. Montanez ("Plaintiff" or "Ms. Montanez") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons explained herein, the undersigned recommends that the Court **VACATE AND REMAND** the Commissioner's decision for further proceedings consistent with this Report and Recommendation.  On remand, the ALJ should consider all evidence of record and provide a clear and accurate explanation for any findings regarding the weight given to the medical opinion evidence, in particular the treating source opinion of F. Gregory Noveske, M.D.  The ALJ should set forth "good reasons" for not giving controlling weight to any treating source opinions, and those good reasons should both appropriately account for and accurately characterize the relevant medical records and other evidence.

1

## I.        Procedural History

On October 23, 2009, Ms. Montanez filed an application for SSI, alleging a disability

onset date of August 15, 2006.  (Tr. 205, 533.)[1]  She alleged disability due to bipolar disorder

anxiety, and depression.[2]  (Tr. 207.)  Ms. Montanez's application was denied at the initial level

on April 5, 2010 (Tr. 365-67) and upon reconsideration on August 23, 2010 (Tr. 371-73).  She

requested a hearing (Tr. 378), and a hearing was held before an Administrative Law Judge

("ALJ") on September 7, 2011 (Tr. 168-204).  The ALJ issued a decision denying benefits on

October 17, 2011.  (Tr. 266-87 ("2011 Decision").)  On January 25, 2013, the Appeals Council

denied Ms. Montanez's request for review.  (Tr. 288-91.)  Ms. Montanez appealed to the U.S.

District Court (Case No. 1:13-cv-00614), and the case was reversed and remanded on December

30, 2013 (Tr. 238-61) based on a finding that the ALJ's "treatment of Dr. Abraham's opinion did

not conform to the applicable standards" for treating source opinions.  (Tr. 239-40.)  The

Appeals Council issued its remand order on April 17, 2014.[3]  (Tr. 262-65.)

On remand, a video hearing was held before another ALJ on October 6, 2014.  (Tr. 115-

67.)  The ALJ issued an unfavorable decision on December 24, 2014, finding Ms. Montanez had

not been under a disability within the meaning of the Social Security Act since October 23, 2009,

the date the first application was filed.  (Tr. 292-310 ("2014 Decision").)  Ms. Montanez filed

exceptions with the Appeals Council (Tr. 489-94), which declined to assume jurisdiction on

April 14, 2016 (Tr. 314-17).  Ms. Montanez appealed again to the U.S. District Court (Case No.

1:16-cv-01394), and the case was remanded on December 19, 2016, pursuant to a joint motion

---

[1] The citations to the administrative record correspond to the Bates number in the upper right-hand corner.

[2] Ms. Montanez also alleged disability due to physical impairments.  (Tr. 207.)  However, her physical impairments
are not at issue in this appeal.  (ECF Doc. 18.)

[3] The Appeals Council also noted that Ms. Montanez had subsequently filed a claim for SSI on February 25, 2013,
and ordered the claims consolidated.  (Tr. 264.)

for voluntary remand.  (Tr. 322-24.)  The Appeals Council issued its remand order on July 21, 2017.  (Tr. 359-62.)

On remand, a video hearing was held before the ALJ on March 21, 2018.  (Tr. 78-114.) The ALJ issued an unfavorable decision on January 16, 2019, finding Ms. Montanez had not been under a disability within the meaning of the Social Security Act since August 15, 2006, the alleged onset date.  (Tr. 11-77 ("2019 Decision").)  Ms. Montanez filed exceptions to the 2019 Decision with the Appeals Council (Tr. 515-32), which declined to assume jurisdiction on June 4, 2020 (Tr. 1-5), making the 2019 Decision the final decision of the Commissioner.

Ms. Montanez filed the pending appeal on January 28, 2022.[4]  (ECF Doc. 1.)  Thereafter, on July 15, 2022, this matter was remanded pursuant to sentence six of Section 205 upon the joint request of the parties to correct transcript deficiencies.  (ECF Doc. 12.)  Upon Defendant's motion, the case was reponed on December 1, 2023, and reinstated to the Court's active docket. (Tr. 14.)  The matter is fully briefed.  (ECF Docs. 18, 21, 22, 23.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Montanez was born in 1966.  (Tr. 174, 350.)  She was 40 years old on the alleged onset date and 52 years old when the 2019 Decision was issued.  (Tr. 65.)  She has a limited education.  (*Id*.)  She has a criminal history involving drugs, receiving stolen property, and disorderly conduct, and was incarcerated from 2002 through 2004 and 2006 through 2009.  (Tr. 31, 234, 1551.)  She worked in the past as a waitress, cook, and fast-food worker (Tr. 193, 198-99, 637) and last worked in 2006 (Tr. 1035).  The ALJ found Ms. Montanez had no past relevant work.  (Tr. 17, 65.)

---

[4] Plaintiff requested and received from the Appeals Council additional time to file her civil action.  (ECF Doc. 1-1.)

**B. Medical Evidence**

**1. Relevant Treatment History**

Ms. Montanez's mental health treatment has been primarily through the Nord Center, since at least October 2009. (Tr. 1034-47, *see also* ECF Doc. 21, pp. 2-9 (Plaintiff's Amended Facts Table).)

2009

After her release from prison in September 2009, Ms. Montanez presented to Ilma Bokman, PC LSW, at the Nord Center on October 14, 2009, for a diagnostic assessment.[5] (Tr. 1034.) She presented with a prior diagnosis of bipolar disorder, history of drug dependency, and a long history of instability and mental health treatment. (*Id.*) She was residing at a shelter. (Tr. 1035.) On mental status examination, her demeanor, eye contact, activity, and speech were average. (Tr. 1045.) There were no delusions or hallucinations. (*Id.*) Her thought process was logical, her mood was euthymic, and she was cooperative. (*Id.*) Her affect was flat. (*Id.*) There was no cognitive impairment reported, but she displayed poor insight and judgment. (*Id.*) Her intelligence was estimated to be in the borderline range. (*Id.*) She was taking Remeron for depression and Vistaril for anxiety. (Tr. 1037.) She was prescribed Seroquel but was not taking it because it made her "thirsty, hungry, and high." (Tr. 1034, 1037.) Her diagnoses included: mood disorder, NOS; rule out bipolar I disorder; and opioid dependence in reported full sustained remission. (Tr. 1043.) A psychiatric evaluation was recommended. (*Id.*)

On November 11, 2009, Ms. Montanez presented to Praveen Abraham, D.O. at the Nord Center for a psychiatric evaluation. (Tr. 1050-51.) She reported that her depressive symptoms included low mood, fatigue, low self-worth, increased appetite, and low interests. (Tr. 1050.)

[5] The assessment was also signed by LSW Bokman's supervisor, whose name is not legible. (Tr. 1044.)

She said that Vistaril was not helping, but Remeron helped with her depression to some extent. (*Id.*)  She reported two past psychiatric hospitalizations, one in 2006 and one in 2000, and three past suicide attempts, but she denied any present suicidal ideation and described no psychotic symptoms.  (*Id.*)  She reported anger issues and described periods of time lasting longer than a week that involved her being "excessively irritable or expansive," "prone to racing thoughts, hyperactivity, rapid talking and disinhibited impulsive behaviors."  (*Id.*)  She denied use of drugs or alcohol at that time.  (*Id.*)

On mental status examination, Ms. Montanez was alert and cooperative; her speech was fluent, goal-directed and intelligible; and her thought processes were logical and sequential.  (Tr. 1051.)  Her affect was restricted, but stable.  (*Id.*)  Dr. Abraham did not observe abnormal psychomotor activities, suicidal or homicidal ideation, or manifest psychosis.  (*Id.*)  Ms. Montanez showed no gross cognitive deficits and appeared to understand the material they discussed.  (*Id.*)  Her insight and judgment were fair.  (*Id.*)  She was diagnosed with bipolar disorder, type I and heroin and cocaine abuse in full remission.  (*Id.*)  Dr. Abraham continued Ms. Montanez on Remeron and added Seroquel.  (*Id.*)  He concluded that Ms. Montanez was in a stable psychiatric condition and not a safety risk to herself or others.  (*Id.*)  He instructed her to follow up in about five weeks.  (*Id.*)

*2010*

In 2010, Ms. Montanez saw Dr. Abraham in February (Tr. 1134), April (Tr. 1131) and August (Tr. 2556-67) for medication management, and met with Nord Center CPST (Community Psychiatric Supportive Treatment) case manager Kelli Sunseri, QMHS, regularly (Tr. 2554-55, 2558-61, 2566-83, 2587-92, 2595-98).[6]  Ms. Sunseri took Ms. Montanez places, ran errands with

---

[6] Ms. Sunseri was formerly known as Kelli Ilcisko.  (Tr. 81.)

her, assisted her with obtaining benefits, completing paperwork, and paying utilities, and provided supportive listening and feedback regarding Ms. Montanez's concerns. (*Id.*)

In February 2010, Dr. Abraham discontinued Seroquel because Ms. Montanez reported it was not helpful and was causing anxiety. (Tr. 1134.) She also described manic symptoms and her speech was pressured. (*Id.*) Dr. Abraham prescribed Gedeon and continued Remeron. (*Id.*) He noted that Ms. Montanez was stable, but also symptomatic and unimproved. (*Id.*) When Ms. Montanez returned to Dr. Abraham in April 2010, she reported she had stopped Gedeon because it was causing nervousness. (Tr. 1131.) She continued to take Remeron, but she was still having mood swings and aggression and her speech was pressured. (*Id.*) Dr. Abraham continued Remeron and added Abilify and Vistaril and noted that Ms. Montanez indicated she might choose to see another psychiatrist because he was not prescribing the medications she wanted. (*Id.*) He noted Ms. Montanez was stable but symptomatic. (*Id.*)

When Ms. Montanez saw Dr. Abraham in August 2010, she reported she was doing consistently well. (Tr. 2556.) With the exception of worrying about everyday stressors, she reported no acute symptoms and the only medication she was taking was Remeron, as needed for sleep. (*Id.*) Dr. Abraham observed that Ms. Montanez was "calm, pleasant, polite, expressive, engaging, and with a stable appropriate affect." (*Id.*) He also observed that her insight did not appear impaired. (*Id.*) Dr. Abraham recommended that Ms. Montanez continue with the "unconventional" regimen of taking only Remeron as needed for sleep since other medications had failed and because she appeared to be doing well. (*Id.*)

In September 2010, Ms. Montanez informed Ms. Sunseri she was only taking Remeron about three times each week. (Tr. 2578.) She denied and symptoms and indicated that she

appreciated the services being provided to her.  (*Id*.)  In October 2010, Ms. Sunseri observed Ms. Montanez to be pleasant and communicative and she had a bright affect.  (Tr. 2582-83.)

When Ms. Montanez met with Ms. Sunseri in December 2010, she was cooperative and oriented, but she appeared manic and agitated.  (Tr. 2587, 2589.)  Ms. Montanez's speech was rapid, she paced, she had racing thoughts, and she had angry outbursts.  (Tr. 2587, 2589, 2591, 2595.)  She expressed interest in reuniting with her 13-year-old daughter but not knowing how to get in contact with her and talked about it obsessively.  (Tr. 2589, 2591.)  She said she had been going to the Gathering Hope House to use their computers to check her Facebook account and to stay in contact with her family.  (Tr. 2587.)  She also volunteered and enjoyed playing bingo at Gathering Hope House.  (Tr. 2587, 2591.)  She reported stressors relating to her boyfriend and his family.  (Tr. 2587, 2589.)  She said she was only taking her medication when needed; she said she did not want to be on medication, and was put on medication that she did not want to be on.  (*Id*.)  Ms. Sunseri reminded Ms. Montanez of the importance of being compliant with her medication.  (*Id*.)  She appeared slightly paranoid.  (Tr. 2591.)  She said she thought someone was in her house and saw shadows when she was home alone; she showed Ms. Sunseri that her door did not close properly.  (*Id*.)

Also in December 2010, Ms. Montanez transferred her medication management at the Nord Center to Dominic Gomes, M.D.  (Tr. 2593-94.)  Ms. Montanez was cooperative and said that her mood was "ok."  (Tr. 2593.)  Her affect was constricted.  (*Id*.)  Her thought process was concrete.  (*Id*.)  Dr. Gomes discontinued Remeron. (*Id*.)  The following medications were prescribed: phenobarbital, promethazine, and Lithium, clonazepam.  (*Id*.)  After meeting with Dr. Gomes on December 21, 2020 (Tr. 2592-94), Ms. Montanez saw Ms. Sunseri the following day.  (Tr. 2595-96.)  She told Ms. Sunseri that she liked Dr. Gomes and he had changed her

medication.  (Tr.  2595.)  She said her boyfriend did not want her to be on medication.  (*Id.*)  Ms. Sunseri explained that it was important for her to be on medication.  (*Id.*)  Ms. Montanez told Ms. Sunseri that she was recently at the Gathering Hope House, and she thought someone had stolen her ring; she talked about fighting whoever it was that had stolen it.  (*Id.*)  Ms. Sunseri encouraged Ms. Montanez not to fight and discussed Ms. Montanez's past history with her.  (*Id.*)

*2011*

When Ms. Montanez returned to Dr. Gomes on January 4, 2011, no changes were made to her medications.  (Tr. 1217-18.)  It was noted that she had not started Lithium because she still had to have lab work.  (Tr. 1217.)  She said she would get her lab work done that day.  (*Id.*)  She also saw Ms. Sunseri on the same day.  (Tr. 1219-20.)  Ms. Sunseri went with Ms. Montanez to get her lab work done.  (Tr. 1219.)  She reported she was afraid of overdosing on Lithium because she knew someone who had.  (*Id.*)  Ms. Montanez talked about going to Connecticut to look into an inheritance she was supposed to receive and to look for information about a daughter who had been adopted.  (*Id.*)

On January 17, 2011, Ms. Montanez presented to Pamela Vaughn, LSW, at the Nord Center for crisis intervention.  (Tr. 1816-17.)  She was very upset, agitated, and loud but directable.  (Tr. 1816.)  Her thoughts were tangential and circumstantial, and she was initially demanding.  (*Id.*)  She was stressed about her prescription for Ativan being stolen.  (*Id.*)  She was also upset because she went to the emergency room for a tooth ache and the only thing that they would give her for pain at the hospital was Tylenol; she said they must have thought she was "some kind of drug addict or something."  (*Id.*)  She was kicked out of the emergency room, and said she was going to go to the newspaper to report how the hospital treated her.  (*Id.*)  She was also upset because she lost her cell phone.  (*Id.*)  After requesting use of another phone, Ms.

8

Montanez was able to locate her phone by calling some people; she was much calmer after she located her phone.  (*Id*.)  LSW Vaughn noted that Ms. Montanez appreciated the support that was provided to her that day and agreed to follow up with her CPST worker.  (*Id*.)

When Ms. Montanez met with Ms. Sunseri the next day, on January 18, 2011, she was cooperative, but her mood was hypomanic.  (Tr. 1215.)  She had rapid speech, flight of ideas, and was difficult to follow.  (*Id*.)  They discussed that Ms. Montanez had tested positive for marijuana.  (*Id*.)  Ms. Montanez talked about going to the hospital for tooth pain, reporting that she was mistreated while at the hospital.  (*Id*.)  She said she was smoking marijuana to help with the tooth pain and said she did not smoke often and felt bad about relapsing.  (*Id*.)  She said she forgot things when she took her medication, and she did not like how her medication made her feel.  (*Id*.)  She also thought her boyfriend's children had taken her medication, but then found it later.  (*Id*.)  She told Ms. Sunseri that her sister went missing in 1998 and her body had been found.  (*Id*.)  She also told Ms. Sunseri that she felt she was in danger and had been contacted by a detective from out of state regarding her sister; the same detective reportedly told her there was a warrant for her, but that he would make a deal with her if she helped him with her sister's case. (*Id*.)  Ms. Montanez said she was continuing to enjoy the Gathering Hope House and had been volunteering and participating in different activities there.  (*Id*.)

The following day, on January 19, 2011, Ms. Montanez presented to the Nord Center for crisis intervention with Yvett Ellison, RN.  (Tr. 1814-15.)  Ms. Montanez was upset and afraid about leaving her keys in a man's van.  (Tr. 1814.)  The man had not returned her keys and she was afraid he would make a copy of her key, come to her apartment, and force her to have sex with him.  (*Id*.)  RN Ellison encouraged Ms. Montanez to call the individual, which she did.  (*Id*.)

When there was no answer, RN Ellison provided Ms. Montanez with the number for the police department so she could make a report the next day if the keys were not returned to her.  (*Id*.)

On February 2, 2011, Ms. Montanez returned to Dr. Gomes.  (Tr. 1207-08.)  She was cooperative, but presented with a dysphoric affect, upset mood, and rapid and pressured speech.  (Tr. 1207.)  She reported she had been "kicked from the hospital."  (*Id*.)  She said she eventually received a prescription from her primary care physician to treat her tooth infection.  (*Id*.)  She also said her apartment door had not been fixed and she was having problems with a tenant in her building.  (*Id*.)  She requested a letter saying that she could have "therapeutic dog" in her apartment.  (*Id*.)  Dr. Gomes discontinued Lithium and added Seroquel to Ms. Montanez's medications.  (*Id*.)  Ms. Montanez agreed to stop using marijuana.  (*Id*.)

During the month of February 2011, Ms. Montanez met with Ms. Sunseri and another CPST worker, Jessica Smith, BA, QMHS, multiple times.[7]  (Tr. 1181-1206, 1209-10, 1455-56.)  At times, she presented with rapid speech, racing thoughts, and manic behavior (Tr. 1193, 1205); she was tearful and agitated (Tr. 1195, 1205, 1209); and her affect was dysphoric (Tr. 1209).  She reported ongoing issues with her boyfriend's family, her landlord, and her neighbors.  (Tr. 1199, 1201, 1205, 1209.)  She said her landlord had not fixed her door and had threatened to evict her if she did not get rid of her dog.  (Tr. 1199.)  She continued to have difficulty controlling her anger and had been suspended from the Gathering Hope House bus.  (Tr. 1197.)  The bus driver reportedly said inappropriate things to her and she felt she had to stick up for herself.  (*Id*.)  Ms. Smith discussed with her the importance of controlling her anger and not letting other people overwhelm her.  (*Id*.)  Ms. Montanez was cooperative and acknowledged that it was important for her to control her anger, but she continued to have a hard time taking

---

[7] Ms. Smith was providing CPST services to Ms. Montanez while Ms. Sunseri was out of the office.  (Tr. 1201.)

responsibility for her own actions and tended to blame others for her behavior.  (*Id*.)  She said

her landlord fixed her door, but she continued to feel that neighbors were trying to break in.  (*Id*.)

In February 2011, Ms. Montanez also presented to the Nord Center for a crisis

assessment (Tr. 1804-09) and crisis intervention (Tr. 1812-13).  She called the Nord Center

hotline on February 7, 2011, requesting that someone come to her home.  (Tr. 1804.)  Assessor

Ralph Hancock, MALP, met with Ms. Montanez.  (*Id*.)  She was in emotional distress and said

she was being threatened by someone and her life was in danger.  (*Id*.)  She said that the wife of

her fiancé's son was making false accusations about her, saying she had stolen a bracelet, and

was trying to harm her minor daughter.  (Tr. 1804.)  Ms. Montanez showed Mr. Hancock copies

of text messages regarding the accusations and she said she had made a police report regarding

the matter the night before.  (*Id*.)  She also talked about: her eight children who had been taken

from her at various times; her two sisters who had died, one who died in a car wreck and one

who was shot; her stillborn son; and not feeling safe at home.  (*Id*.)  Mr. Hancock noted that Ms.

Montanez stabilized throughout the session and reported she was feeling better at the end of the

assessment.  (*Id*.)  After Ms. Montanez stabilized and Mr. Hancock consulted with Christopher

Gerome, LPCC, Ms. Montanez was left at home with instructions to use the hotline as needed.

(Tr. 1808.)  On February 15, 2011, Ms. Montanez presented to LSW Vaughn for crisis

intervention, demanding that she be provided help in getting to an appointment that morning.

(Tr. 1812-13.)  She was tearful and demanding, and her thoughts appeared tangential and

circumstantial.  (Tr. 1812.)  She reported feeling like no one was willing to help her.  (*Id*.)  She

received assistance in getting to her appointment.  (*Id*.)

Ms. Montanez presented to Dr. Gomes twice in March 2011 (Tr. 1177-80) and once in

early April 2011 (Tr. 1305-06).  On March 1, 2011, she told Dr. Gomes she was upset with the

staff because she was not getting help. (Tr. 1179.) She said she was not taking the Seroquel as prescribed because it sedated her. (*Id*.) She preferred Xanax, saying it helped her function better. (*Id*.) She had been going to the center daily with her dog but did not follow directions. (*Id*.) Dr. Gomes discontinued clonazepam, continued phenobarbital and promethazine, and added Risperdal and Xanax. (*Id*.) Ms. Montanez returned to Dr. Gomes two weeks later, on March 16, 2011. (Tr. 1177-78.) She reported taking Risperdal for only one week; she was accused of selling Xanax but denied doing so. (Tr. 1177.) She was not getting along with her husband's children, and they were threatening her via text and stole her X-Box, laptop, and medication. (*Id*.) However, she told Dr. Gomes at the end of their session that they had returned her Risperdal. (*Id*.) Dr. Gomes recommended that Ms. Montanez start Risperdal Consta IM (intramuscular injection) as soon as available. (*Id*.) When Ms. Montanez returned to Dr. Gomes on April 5, 2011, she said that a man broke into her house, but her dog saved her, and nothing was taken or damaged. (Tr. 1305.) Ms. Montanez refused to take the injectable medication Dr. Gomes prescribed, so he ordered the medication in a tablet. (*Id*.) However, Dr. Gomes also advised that management of Ms. Montanez's medication would have to be transferred to another provider because he felt he could not stabilize her without the injection. (*Id*.)

In early April 2011, Ms. Montanez showed up at the Nord Center twice and followed a support staff worker around the parking lot and made statements that made the worker feel intimidated. (Tr. 1164.) Judy Hyde, LPCC-S at the Nord Center discussed Ms. Montanez's behavior with her. (Tr. 1164-65.) Ms. Montanez had a difficult time accepting responsibility for her actions, but became tearful after she realized how she made the worker feel. (Tr. 1164.) Ms. Montanez was reminded that she could not show up at the Nord Center unless she had an

appointment, and that she should work with her designated CPST worker on the things she needed help with when she was scheduled to meet with her.  (*Id*.)

During a CPST session with Ms. Sunseri on April 12, 2011, Ms. Montanez presented as calm, but was difficult to redirect and demonstrated flight of ideas.  (Tr. 1162.)  Ms. Sunseri assisted Ms. Montanez with reading her mail, problem solved strategies for Ms. Montanez to better manage stressors, and provided support and feedback to Ms. Montanez regarding stories and events that she shared.  (*Id*.)  Ms. Montanez reported she had not yet attended anger management group sessions, but she was still planning on attending.  (*Id*.)  Ms. Sunseri informed Ms. Montanez she would be seeing Dr. Saini for medication management.  (*Id*.)

On April 19, 2011, Ms. Montanez presented to Dilbagh Saini, M.D., for medication management.  (Tr. 1160-61.)  She reported that her doctor "fired" her because she was unwilling to have the Risperdal shot because it made her too sleepy.  (Tr. 1160.)  Dr. Saini observed that Ms. Montanez's mood was fine.  (*Id*.)  He also observed that her affect was elevated, her thought process was linear, and she was only superficially cooperative.  (*Id*.)  Dr. Saini increased Ms. Montanez's dose of Risperdal and decreased her dose of Xanax.  (*Id*.)  He encouraged medication compliance.  (*Id*.)  Ms. Montanez saw Dr. Saini in May, July, September, and November 2011; no significant changes were noted and her medications were continued.  (Tr. 1295-1302.)  At her November 3, 2011 appointment with Dr. Saini, she relayed that she was denied social security because she showered and kept her house clean, which she said meant, "I should look dirty to get social security."  (Tr. 1295.)  She reported that she was only taking Risperdal at night and felt she was doing okay on that dose.  (*Id*.)

Ms. Montanez continued to meet with Ms. Sunseri throughout 2011.  (Tr. 1152-59, 1387-1418.)  Aside from feeling sad and depressed in May when her dog died (Tr. 1154, 1156), Ms.

Montanez was generally doing okay from April through early-August 2011 and reported being compliant with her medication.  (Tr. 1152-59, 1403-18.)  When Ms. Montanez met with Ms. Sunseri on August 9, 2011, she reported that she was only taking one Xanax instead of two because it made her feel better.  (Tr. 1401-02.)

During a September 15, 2011 meeting with Ms. Sunseri, Ms. Montanez had rapid speech. (Tr. 1397-98.)  She reported feeling nervous about an upcoming medical procedure and said she had not yet heard back as to the outcome of her social security hearing, which she was told could take up to six months.  (Tr. 1397.)  When Ms. Montanez met with Ms. Sunseri the following month, on October 28, 2011, she was oriented and cooperative, but she had rapid speech and she was anxious.  (Tr. 1395-96.)  She reported she was having some issues with her neighbors.  (Tr. 1395.)  She reported medication compliance.  (*Id*.)  When Ms. Montanez met with Ms. Sunseri on November 3, 2011, she reported she was not taking her Risperdal and Dr. Saini had yelled at her about it.  (Tr. 1393-94.)  She also reported having issues with other tenants in her building. (Tr. 1393.)  Ms. Sunseri encouraged medication compliance and assisted Ms. Montanez in calling her disability attorney to determine whether he would be appealing the denial of social security.  (*Id*.)  Ms. Montanez agreed to become medication compliant.  (*Id*.)  On November 29, 2011, Ms. Sunseri met with Ms. Montanez at her house and informed Ms. Montanez that Dr. Saini was leaving the agency and she would be assigned a new psychiatrist.  (Tr. 1391-92.)  Ms. Montanez reported that she was medication compliant and "doing okay."  (Tr. 1391.)

In December 2021, Ms. Montanez reported to Ms. Sunseri that she was still having issues with her neighbor.  (Tr. 1387-90.)  They talked about Ms. Montanez working.  (Tr. 1389.)  She said she did not work because she did not have rides anywhere, but she was going to try to take the driver's test to get her license and then would work on getting a car.  (*Id*.)  She reported

spending time with her family and playing games on the computer.  (Tr. 1387, 1389.)  Ms. Sunseri showed her how to use social network sites as a way to increase her socialization.  (Tr. 1389.)  Ms. Montanez had been trying to get in contact with one of her daughters, but had not been successful in her efforts.  (Tr. 1387.)  When Ms. Montanez met with Ms. Sunseri on December 22, 2011, she reported feeling good with no symptoms, but said she had run out her medication the day before.  (*Id*.)

### *2012*

Ms. Montanez continued to meet with her CPST case manager Ms. Sunseri throughout 2012.  (Tr. 1329-86.)  On January 11, 2012, Ms. Montanez said she had just refilled her medication.  (Tr. 1385.)  She reported missing her appointment with Dr. Noveske because she had no transportation, but she said she had enough medication until she saw Dr. Noveske the following month.  (*Id*.)  She continued to report that she was medication compliant in January and February 2012.  (Tr. 1379-84.)  Ms. Montanez was cooperative, and her mood was appropriate when she met with Ms. Sunseri on February 23, 2012.  (Tr. 1381.)  She said she was taking care of an ill neighbor.  (*Id*.)  She reported no symptoms or side effects.  (*Id*.)  But she was manic with rapid speech and racing thoughts, and her mood/affect was preoccupied, during a visit at her home with Ms. Sunseri the following week, on February 28, 2012.  (Tr. 1379.)  Ms. Montanez said she thought she needed a higher dose of Xanax because she was feeling anxious.  (*Id*.)  She was continuing to help care for her neighbor and said she was interested in getting transportation so she could try to find a job.  (*Id*.)

On March 6, 2012, Ms. Montanez met with Ms. Sunseri.  (Tr. 1377-78.)  She demonstrated rapid speech, racing thoughts, inappropriate behavior, and was manic and difficult to redirect.  (Tr. 1377.)  Ms. Sunseri assisted Ms. Montanez with completing paperwork to

15

reapply for Shelter Plus Care and went with Ms. Montanez to a meeting for Shelter Plus Care.

(*Id*.)  While there, it was difficult from Ms. Sunseri to redirect Ms. Montanez; she had to prompt

Ms. Montanez to cooperate with the Shelter Care Plus staff.  (*Id*.)  Ms. Montanez said she was

compliant with her medication, but also said she took an extra Xanax sometimes to help calm

herself down when she was really anxious.  (*Id*.)  She continued to display manic symptoms

during meetings with Ms. Sunseri in March 2012.  (Tr. 1371-76.)

On March 28, 2012, Ms. Montanez presented to F. Gregory Noveske, M.D., for

medication management (Tr. 1293-94) and met with Ms. Sunseri (Tr. 1369-70).  She arrived a

half-hour late for her appointment with Dr. Noveske.  (Tr. 1293.)  She reported a history of

incarceration and substance abuse.  (*Id*.)  She lived with her boyfriend, attended school to study

computers, and attended church weekly but missed occasionally.  (*Id*.)  She said she did not like

taking Risperdal because it made her too tired, and she would not take most antidepressants

because of unwanted side effects.  (*Id*.)  She reported that only Xanax helped, but also said that a

low dose of Remeron helped with her sleep.  (*Id*.)  Dr. Noveske expressed a concern with her

taking Xanax given her substance abuse history.  (*Id*.)  In response, Ms. Montanez said she was

not sure she would return to see him but wanted to discuss it with her counselor.  (*Id*.)  Dr.

Noveske lowered Ms. Montanez's dose of Xanax with the intent to discontinue it when Ms.

Montanez returned for her next appointment.  (*Id*.)  Dr. Noveske also discontinued Risperdal,

because she refused to take it, and added Remeron.  (*Id*.)

During her CPST session with Ms. Sunseri on March 28, 2012, Ms. Montanez admitted

that she had been lying about being medication compliant; she was not compliant, but committed

to taking her medication again.  (Tr. 1369.)  Ms. Montanez thought her phone was tapped by the

police.  (*Id*.)  She had called the hotline the night before but denied being suicidal and reported

16

feeling better.  (*Id*.)  She said she was upset about things her children had been saying to her and was having issues with a neighbor.  (*Id*.)  She had tried to reach out to her neighbor because she was depressed, but her neighbor reported that she was at the neighbor's house because she wanted to kill herself.  (*Id*.)  Ms. Montanez noted that Dr. Noveske was trying to wean her off Xanax, and Ms. Sunseri encouraged her to follow her doctor's recommendations.  (*Id*.)

On April 4, 2012, Ms. Montanez was calm with an appropriate mood.  (Tr. 1367-68.) She reported she was compliant with her medication.  (Tr. 1367.)  She also told Ms. Sunseri she was planning a trip to Florida for a couple of weeks to see her family; she was excited about the visit.  (*Id*.)  She provided Ms. Sunseri with keys to her apartment.  (*Id*.)  On April 11, 2012, Ms. Montanez said she was going to travel to Connecticut to turn herself in for a trespassing charge; she was also going to try to get custody of her daughter and look into whether she received an inheritance.  (Tr. 1365-66.)  She was scared to go to Connecticut, but her brother was going to go with her.  (Tr. 1365.)  She said that the case of her sister going missing remained unsolved, and that she said she was continuing to have problems with her neighbors.  (*Id*.)  She thought the police were watching her because her neighbor said she was selling her Xanax.  (*Id*.)  The following week, on April 18, 2012, Ms. Montanez presented as oriented, but was paranoid, anxious, and manic.  (Tr. 1363-64.)  She said that her neighbor's friend tried to get her into his car and she reported it to the police.  (Tr. 1363.)  She continued to believe the police were tapping her phone.  (*Id*.)  Ms. Sunseri helped Ms. Montanez access her online ticket information for her upcoming travel.  (*Id*.)

On April 27, 2012, Ms. Montanez presented to Sharon Ballew, QMHS, at the Nord Center for crisis intervention.  (Tr. 1810-11.)  She had walked into the Nord Center, loud and cursing, and said she locked herself out of her apartment and needed the keys she had provided

to her case manager.  (Tr. 1810.)  She also reported that she was arrested that morning for trespassing and making threats against a neighbor, and that the neighbor had filed a restraining order against her.  (*Id*.)  Ms. Montanez was angry, very loud, irritable, anxious, and labile.  (*Id*.)  Her speech was pressured and she appeared paranoid that people were coming into her apartment or listening in on her.  (*Id*.)  Her thought process was tangential and circumstantial.  (*Id*.)  She remained directable.  (*Id*.)  Ms. Montanez denied any plan to hurt herself or someone else because she wanted to regain custody of her children and did not want to return to jail.  (*Id*.)  They called the landlord, who said that Ms. Montanez would have to call a locksmith.  (*Id*.)  Ms. Montanez said she just wanted her keys to her apartment; she did not want to be evaluated and left with the lady who had brought her there.  (*Id*.)

Ms. Montanez was taken to the Mercy Regional Medical Center by the police on June 8, 2012, after she was arrested on outstanding warrants and threatened to kill herself.  (Tr. 1730-34, 1798-1803.)  She said that she told the police: "I will kill myself if I go to jail."  (Tr. 1734, *see also* Tr. 1798.)  The Nord Center was called to conduct a crisis assessment.  (Tr. 1798-1803.)  James West, LSW, conducted the assessment, which was also signed by his supervisor Lisa Zaghet, LISW-S.  (Tr. 1803.)  Ms. Montanez reported: travelling to Connecticut in May 2012 because she was supposed to have an inheritance, but someone stole all her money; not wanting to return to Ohio; and feeling that people were trying to set her up.  (Tr. 1798.)  She said one of her neighbors was recording all her phone conversations and trying to evict her.  (*Id*.)  She also said she had not taken her psychiatric medications for a month because someone stole them when she was in a homeless shelter.  (*Id*.)  She was actively engaged during the assessment, but was crying throughout, and was angry and irritable.  (Tr. 1799.)  Her affect was flat, and her thought content was noted to be "helpless," "hopeless," and "worthless."  (*Id*.)  Her thought

process was noted to be "racing" and "confused," and she was reported to say: "I can't stop thinking and I can't stop talking"; "My mind is like a computer that I can't turn off." (*Id*.) She had normal speech. (*Id*.) She was fully oriented, her memory was fair, and her eye contact was average. (Tr. 1800.) Her judgment was "poor," but she denied suicidal and homicidal ideation, plan, or intent. (*Id*.) She was diagnosed with mood disorder, NOS and bipolar disorder, most recent episode manic, unspecified. (Tr. 1801.) She was on a police hold. (Tr. 1802.) Once she was assessed, it was recommended that she be returned to the police and resume her mental health services at the Nord Center once her legal obligations were determined. (*Id*.)

On June 11, 2012, Ms. Montanez presented to Dr. Noveske. (Tr. 1291-92.) She discussed her recent arrest and involuntary commitment at the hospital. (Tr. 1291.) She was very angry about her involuntary commitment and said she wanted to sue. (*Id*.) She said she had not taken her medication when she was out of state and had restarted Remeron the day before. (*Id*.) She refused to take Risperdal; she only wanted to take Remeron and Xanax. (*Id*.) Dr. Noveske increased her dose of Remeron and discontinued Xanax. (*Id*.) She denied using alcohol or other illicit substances; no suicidal or homicidal ruminations were noted; and she reported she was sleeping and eating well. (*Id*.)

Ms. Montanez met with Ms. Sunseri in June and July 2012. (Tr. 1355-60.) She reported ongoing issues with her neighbors (Tr. 1357, 1359, 1364) and was "fixated on sexual ideas" (Tr. 1357). She was calm and cooperative when she met with Ms. Sunseri on July 10, 2012. (Tr. 1364.) She reported she was compliant with medications, but she did not want to take an injectable medication, noting she was a "an ex-junkie" and "want[ed] to stay that way," and was scared of needles. (*Id*.)

Ms. Montanez returned to Dr. Noveske on July 16, 2012. (Tr. 1289-90.) She appeared calmer but was angry about her recent hospitalization, saying she was handcuffed by the police and given an injectable medication. (Tr. 1289.) She attended the visit with her boyfriend. (*Id*.) Dr. Noveske talked again about starting a mood stabilizer and Ms. Montanez agreed to restart Risperdal. (*Id*.)

Ms. Montanez continued to see Ms. Sunseri approximately every week (Tr. 1347-54) until she next met with Dr. Noveske on September 10, 2012 (Tr. 1287-88). During meetings with Ms. Sunseri in August, Ms. Montanez reported medication compliance. (Tr. 1349-54.) She was no longer taking Xanax and said she was doing okay without it. (Tr. 1351.) She was getting along better with her neighbors. (Tr. 1349-52.) When she saw Dr. Noveske on September 10, 2012, she reported feeling "somewhat calmer" on her medication and said her irritability was better. (Tr. 1287.) Dr. Noveske made no changes to Ms. Montanez's Risperdal dose. (*Id*.)

Ms. Montanez continued to meet with Ms. Sunseri for CPST services on a regular basis in September and October 2012. (Tr. 1333-46.) She informed Ms. Sunseri that things were better at her apartment. (Tr. 1345.) She was still dealing with the court case relating to her past problems with her neighbors, but she was no longer having issues with her neighbors. (*Id*.) Ms. Sunseri continued to accompany Ms. Montanez on community outings and assist her with completing paperwork to obtain assistance from agencies. (Tr. 1337, 1339, 1341, 1343.) Ms. Montanez expressed interest in applying for jobs and Ms. Sunseri provided her with names of employers who were hiring. (Tr. 1339.) Ms. Sunseri noted that Ms. Montanez reported compliance with her medication (Tr. 1335), seemed to have her symptoms in good control (Tr. 1339), and seemed to be functioning at baseline (Tr. 1335, 1337, 1339).

On November 7, 2012, Ms. Montanez returned to Dr. Noveske.  (Tr. 1285-86.)  She was continuing to do well.  (Tr. 1285.)  Her mood was good, with "[m]uch less affective lability with Rispderal."  (*Id*.)  She appeared to be tolerating Risperdal well, except for some dry mouth.  (*Id*.)  Her personal life was also going well.  (*Id*.)

When Ms. Montanez met with Ms. Sunseri on November 16, 2012, she reported medication compliance and said she continued to be in contact with her family and enjoyed receiving updates regarding her grandson.  (Tr. 1331.)  She said she had to return to court again in December, but she was not sure why.  (*Id*.)  Her neighbor told her someone was letting air out of her tires, but she believed her neighbor was trying to get her in trouble; she was not leaving her apartment.  (*Id*.)  When Ms. Montanez met with Ms. Sunseri on December 19, 2012, Ms. Sunseri had to redirect her in order to complete her grocery shopping.  (Tr. 1329.)

*2013*

On January 4, 2013, Ms. Montanez had to be redirected by Ms. Sunseri again to complete her grocery shopping.  (Tr. 1327.)  Ms. Montanez told Ms. Sunseri that another client of the Nord Center had been showing up at her house and was rude and bothering her.  (*Id*.)  On January 29, 2013, Ms. Sunseri noted that Ms. Montanez appeared to be anxious regarding a possible MS diagnosis.  (Tr. 1325.)  Ms. Montanez talked about a future trip in October to attend her daughter's wedding in Florida.  (*Id*.)

On February 13, 2013, Ms. Montanez presented to Ms. Sunseri as cooperative and oriented but anxious.  (Tr. 1323.)  She had received an unfavorable social security decision and reported she was "getting 'stressed out.'"  (*Id*.)  She said her neighbor who had a restraining order against her continued to come to her house and denied issues with the neighbors.  (*Id*.)  Ms. Sunseri noted that Ms. Montanez appeared to have increased symptoms.  (*Id*.)  The following

week, however, on February 20, 2013, Ms. Sunseri noted that Ms. Montanez appeared to be medication compliant.  (Tr. 1321.)  Ms. Montanez also saw Dr. Noveske on February 20, 2013.  (Tr. 1283-84.)  Ms. Montanez reported she had not been taking her medication regularly because she was running out and had not called for a new prescription.  (Tr. 1283.)  Overall, she was emotionally stable, but she was being evaluated for possible MS and was upset because she was denied social security.  (*Id.*)  She denied suicidal ideation and her sleep was normal.  (*Id.*)  No changes were made to Ms. Montanez's medications.  (*Id.*)

Ms. Montanez was in good control of her symptoms when she met with Ms. Sunseri on February 27, 2013 (Tr. 1319-20) and there were no significant issues identified by Ms. Sunseri during their meetings from February through the end of April 2013 (Tr. 1315-18, 1591-94.)  On April 30, 2013, Ms. Montanez reported she was doing good.  (Tr. 1591.)  She said she enjoyed watching television and spending time with her boyfriend and family.  (*Id.*)  She denied issues with other tenants in her building (*id.*), but she did note some security and safety concerns in her apartment building (*see e.g.*, Tr. 1315, 1593).

On May 15, 2013, Ms. Montanez saw Dr. Noveske.  (Tr. 1589-90.)  She was stable and her affect was bright.  (Tr. 1589.)  There were no vegetative symptoms.  (*Id.*)  No changes were made to Ms. Montanez's medications.  (*Id.*)  When Ms. Montanez saw Ms. Sunseri the following day, she reported medication compliance and appeared to be medication compliant and functioning at baseline.  (Tr. 1587.)

When Ms. Montanez saw Ms. Sunseri on June 4 and 18, 2013, Ms. Sunseri noted that Ms. Montanez appeared to be medication compliant and functioning at base line.  (Tr. 1583, 1585.)  However, Ms. Montanez reported she felt paranoid when she left the house and felt like she had PTSD from bad things that had happened to her, like her sister disappearing, her sister

dying, and her kids being taken from her. (Tr. 1585.) She also reported that one of her neighbors was giving her and another neighbor a hard time about planting vegetables. (Tr. 1583.) At the end of June 2013, Ms. Montanez was oriented, but she presented as hyper with pressured speech. (Tr. 1581-82, *see also* Tr. 1579.) She continued to report issues with her neighbors. (Tr. 1579, 1581.) Ms. Montanez said that the stress with her neighbors was causing an increase in her symptoms. (*Id*.) She also said that her social security was denied again. (*Id*.) Ms. Sunseri encouraged her to look for employment. (*Id*.) Ms. Montanez said she was compliant with her medication. (*Id*.)

When Ms. Montanez saw Ms. Sunseri on July 18, 2013, she continued to report problems with her neighbors. (Tr. 1577-78.) She also said that her medication was making her "bones hurt." (Tr. 1577.) On August 2, 2013, Ms. Sunseri assisted Ms. Montanez in calling her neurologist to obtain a transfer to another doctor in the practice; but they were informed by the receptionist that Ms. Montanez was not "allowed to return as a patient." (Tr. 1575-76.) Ms. Sunseri noted that Ms. Montanez appeared to be functioning at baseline and appeared to be medication compliant. (Tr. 1575.)

On August 12, 2013, Ms. Montanez returned to Dr. Noveske. (Tr. 1571-72.) She was stable but was upset that her boyfriend's daughter and her children were moving out of state. (Tr. 1571.) She also expressed some concerns regarding her boyfriend's health. (*Id*.) Otherwise, she was cheerful in the office and reported that her health had been good. (*Id*.) Dr. Noveske made no medication changes. (*Id*.)

During meetings with Ms. Sunseri every few weeks from August through early-November 2013, Ms. Montanez expressed some concern over being able to pay her bills and purchase personal care items. (Tr. 1569, 1680, 1682.) She appeared to be medication compliant

and seemed to be functioning at baseline.  (Tr. 1569-70, 1676-83.)  On November 5, 2013, she

reported she could not sleep because a neighbor always had people over and they were loud.  (Tr.

1676.)  She also said she was upset about missing a wedding because it was in Florida.  (*Id*.)  Ms.

Montanez called Ms. Sunseri three days later, on November 8, 2013.  (Tr. 1674-75.)  During that

call, Ms. Sunseri observed Ms. Montanez to be anxious and manic with rapid speech and racing

thoughts.  (Tr. 1674.)  Ms. Montanez said she broke her phone and lost everyone's phone

numbers.  (*Id*.)  Without numbers for her family, she worried about them.  (*Id*.)  Ms. Sunseri was

able to calm Ms. Montanez down.  (*Id*.)

On November 13, 2013, Ms. Sunseri accompanied Ms. Montanez to her appointment

with Dr. Noveske.  (Tr. 1672-73.)  She had a slight increase in anxiety, with rapid speech and

racing thoughts.  (Tr. 1672.)  Dr. Noveske noted that she was "stable from a psychiatric vantage

point but angry in regard to her recent visit to her neurologist's office when she felt she was

being ignored after a three hour wait and became angry with the clerk."  (Tr. 1647.)  Her

neurologist had since terminated the physician-patient relationship.  (*Id*.)  Ms. Montanez talked

with Dr. Noveske about other times she felt she was treated unfairly.  (*Id*.)  She did not express

suicidal ideation.  (*Id*.)  Dr. Noveske observed no vegetative symptoms and noted that Ms.

Montanez smiled at times during the appointment.  (*Id*.)  He made no medication changes.  (*Id*.)

*2014*

Ms. Sunseri met with Ms. Montanez on February 4, 2014 (Tr. 1669-70) and accompanied

her to her appointment with Dr. Noveske on February 5, 2014 (Tr. 1667-68).  Ms. Montanez

informed Ms. Sunseri that she was still having issues with other tenants in her building.  (Tr.

1669.)  She also reported concerns about her daughter who lived in Florida and said she was

planning to go to Florida the following month.  (*Id*.)  Ms. Sunseri assisted Ms. Montanez with

24

reading and understanding her mail.  (*Id.*)  She was in "good spirits" when she saw Dr. Noveske.  (Tr. 1645.)  Aside from "occasional temper outbursts" that were "characteristic since childhood," Ms. Montanez was stable.  (*Id.*)  She was not depressed or irritable and there were no vegetative symptoms.  (*Id.*)  There was no suicidal ideation and no racing thoughts.  (*Id.*)  Dr. Noveske made no medication changes.  (*Id.*)  Ms. Montanez met again with Ms. Sunseri on February 21, 2014.  (Tr. 1665-66.)  Ms. Sunseri assisted her with reading and understanding her mail, completing forms, and reviewing documentation needed for upcoming appointments.  (Tr. 1665.)  Ms. Sunseri noted that Ms. Montanez appeared to be functioning at baseline.  (*Id.*)

When Ms. Sunseri accompanied Ms. Montanez to an appointment to renew her application for housing on March 4, 2014, Ms. Montanez again stated she was planning a trip to Florida to see her children and grandchildren.  (Tr. 1663-64.)  She had not heard anything regarding her social security appeal.  (Tr. 1663.)  Ms. Sunseri encouraged her to try to find employment.  (*Id.*)  Ms. Montanez said she would like to try to get her license back, stating it had been suspended a long time ago in another state.  (*Id.*)  Ms. Sunseri provided Ms. Montanez with contact information so she could look into what would be needed in order to get her license reinstated.  (*Id.*)  Ms. Montanez reported medication compliance and Ms. Sunseri noted that she appeared to be functioning at baseline.  (*Id.*)

Ms. Montanez met with Cassandra Bielawski, MS, at the Nord Center on April 18, 2014, for CPST services.[8]  (Tr. 1661-62.)  She was dressed appropriately, reported no suicidal or homicidal ideation, and was willing to engage, but Ms. Bielawski observed that she appeared anxious, spoke rapidly, and appeared angry when discussing family issues.  (Tr. 1661.)

---

[8] On February 5, 2014, Ms. Sunseri informed Ms. Montanez that she would be leaving the Nord Center and a new case worker would be assigned.  (Tr. 1667-68.)

Ms. Montanez returned to Dr. Noveske on April 30, 2014.[9] (Tr. 1643-44.) She was stable and reported she had traveled to Florida to see her children. (Tr. 1643.) She reported some difficulty sleeping, but also drank coffee well into the evening. (*Id*.) She reported no suicidal ideation. (*Id*.) Dr. Noveske made no medication changes. (*Id*.) After this appointment, Ms. Montanez started to experience an increase in her symptoms. (Tr. 1657, 1655, 1653.) On May 9, 2014, Ms. Bielawski observed that she was energetic, but her thought process was rapid and she changed topics frequently. (Tr. 1657-58.) On May 13, 2014, she observed that Ms. Montanez had difficulty sitting still, continually rocking forward and backward. (Tr. 1655-56.)

On May 28, 2014, Ms. Bielawski went to Ms. Montanez's home after Ms. Montanez reported having problems with a neighbor. (Tr. 1653-54.) Ms. Montanez had called the police and was "angry and agitated" and "could not sit still." (Tr. 1653.) She told the police officer that she was upset at her neighbor, who had filed a report against her when she had not done anything wrong. (*Id*.) The police officer told her there was nothing he could do for her and asked her when she and her boyfriend would be leaving the state. (*Id*.) That response angered and agitated Ms. Montanez and she began yelling at the officer and pacing up and down the driveway. (*Id*.) Ms. Bielawski was unable to de-escalate the situation or redirect Ms. Montanez after the officer left her home, and requested a crisis assessment. (*Id*.) Ms. Montanez was admitted to Mercy Regional Medical Center that day, due to hearing voices and making threats. (Tr. 1712-15.) Her medications were adjusted, and she reported feeling better and stable. (Tr. 1714.) She denied suicidal and homicidal ideation. (*Id*.) She was diagnosed with schizoaffective disorder and discharged on May 31, 2014, with instructions to take medications as prescribed, attend follow up appointments, and use positive support systems. (*Id*.)

---

[9] Ms. Montanez also met with Ms. Bielawski on April 30, 2014. (Tr. 1659-60.) She appeared to be in a good mood during this meeting. (Tr. 1659.)

On June 12, 2014, Ms. Bielawski accompanied Ms. Montanez to her hearing for an aggravated menacing charge stemming from the incident with her neighbor.  (Tr. 1651-52.)  Ms. Montanez was dressed appropriately and was willing to engage and spoke with a logical thought process, but she was also anxious and spoke rapidly.  (Tr. 1651.)  She agreed to a restraining order against her in order to avoid a hearing.  (*Id*.)  Ms. Montanez appeared less anxious after the hearing was concluded and informed Ms. Bielawski that she intended to talk to her landlord to see if she could move to another apartment.  (*Id*.)

At a meeting a few days later, Ms. Montanez told Ms. Bielawski she was leaving for a month-long vacation to see family in July.  (Tr. 1649-50.)  She felt she was the victim in the situation involving her neighbor.  (Tr. 1649.)  They discussed Ms. Montanez's role in the situation, and Ms. Bielawski noted that Ms. Montanez had "limited insight into how her behavior contributed to the situation."  (*Id*.)  They also discussed Ms. Montanez's housing options, and Ms. Montanez said she did not think she could find a new apartment before she left for vacation.  (*Id*.)  Ms. Montanez was well groomed but appeared anxious and upset.  (*Id*.)  She reported she was out of some of her medications, but she was taking the medicine that she did have as prescribed.  (*Id*.)  She reported no suicidal or homicidal ideations.  (*Id*.)

On July 14, 2014, Ms. Montanez was pink slipped at Mercy Regional Medical Center for worsening of psychotic and manic symptoms.  (Tr. 1705-10.)  She had threatened to stab a neighbor.  (Tr. 1706.)  She "appeared very manic and psychotic with severe disorganization and disturbance behavior" on admission, and it took her a couple of days to settle down with a combination of Depakote and Invega.  (Tr. 1705.)  However, she refused to take Depakote after two days, reporting that she had visual floaters after taking it.  (*Id*.)  It was noted that she had a "known significant history of noncompliance with her medications."  (*Id*.)  She was diagnosed

with schizoaffective disorder, bipolar type.  (*Id*.)  She was discharged in stable condition on July 21, 2014, with instructions to follow up with her psychiatrist at the Nord Center.  (*Id*.)

On July 21, 2014, Ms. Sunseri met Ms. Montanez at her house following her hospital discharge.  (Tr. 1776-77.)  Ms. Montanez reported that she was not getting evicted, but that she wanted to move due to issues with the neighbor who had a restraining order against her.  (Tr. 1776.)  Ms. Montanez told Ms. Sunseri that she was having a cookout with her friends on Memorial Day when a neighbor started "drama," and all her guests left.  (Tr. 1776.)  She got upset and yelled at her friends for leaving, but the neighbor heard her and called the police, claiming that Ms. Montanez had been threatening her.  (*Id*.)

Ms. Montanez met with Ms. Sunseri multiple times in August 2014.  (Tr. 1747-64.)  On August 6, 2014, Ms. Sunseri assisted Ms. Montanez with securing a lease on a new place.  (Tr. 1763.)  She had to redirect Ms. Montanez several times to complete the task of viewing the home for rent and signing the lease.  (*Id*.)  Later that day, Ms. Montanez met with Ms. Sunseri to complete her annual ISP and review her treatment goals.  (Tr. 1761-62.)  Ms. Sunseri assisted Ms. Montanez with requesting assistance with moving.  (*Id*.)  She had to redirect Ms. Montanez several times.  (*Id*.)  Ms. Montanez said she thought someone stole her seizure medication, but she planned to double check before calling the police.  (*Id*.)  Ms. Sunseri observed that Ms. Montanez continued to have manic like symptoms.  (*Id*.)  Ms. Sunseri met again with Ms. Montanez on August 7 and 8 to assist her with moving.  (Tr. 1757-60.)  Ms. Montanez was manic with racing thoughts and rapid speech during these meetings.  (Tr. 1757, 1759.)  She reported that a neighbor asked her to buy drugs for her and she responded by holding an object to her neighbor's neck and told her to never come back.  (Tr. 1759.)  Ms. Sunseri discussed risky behaviors with Ms. Montanez and encouraged her not to speak with her neighbors.  (*Id*.)

28

On August 13 and 14, Ms. Sunseri accompanied Ms. Montanez on community outings because Ms. Montanez was impulsive and often lacked the ability to maintain appropriate boundaries.  (Tr. 1753-56.)  Ms. Sunseri observed that Ms. Montanez required constant redirection, she often misinterpreted what other people were saying or doing, and she showed limited coping skills.  (Tr. 1753, 1755.)  On August 13, Ms. Montanez was oriented but manic, with racing thoughts and rapid speech.  (Tr. 1755.)  She informed Ms. Sunseri on August 13 that she had taken medication sent to her by her mother to try to calm down.  (*Id*.)  On August 14, she said she was very anxious and took an Ativan that was given to her by a doctor the last time she was in the hospital.  (Tr. 1753.)

Ms. Montanez returned to Dr. Noveske on August 18, 2014.  (Tr. 1743-44.)  Although she was recently pink slipped, Ms. Montanez's boyfriend, who monitored her medication, said she had been taking her medication regularly.  (Tr. 1743.)  Ms. Montanez denied that she had the intent to harm anyone.  (*Id*.)  She was angry about being hospitalized and given medication that she had not consented to receive.  (*Id*.)  She reported being upset about the case worker assigned to her, but she also said she was glad to be back with her prior case worker.  (*Id*.)  She reported that she was happy with her new home.  (*Id*.)  While hospitalized, Ms. Montanez's Remeron was decreased and her Invega was increased.  (*Id*.)  Dr. Noveske increased Ms. Montanez's Remeron dose, noting it helped with her mood and sleep, but he made no change her Invega dose.  (*Id*.)

Ms. Montanez saw Ms. Sunseri three more times in August 2014.  (Tr. 1747-52.)  She said that Dr. Noveske added Ativan to her medications.  (Tr. 1751.)  Ms. Montanez exhibited increased mania and anxiety, and she had rapid speech and racing thoughts.  (Tr. 1747, 1749, 1751.)  She said she was being harassed by her landlord (Tr. 1749), she was having issues with her boyfriend and one of her friends (*id.*), and she felt she was being bullied by others at the

29

Gathering Hope House (Tr. 1751).  On August 28, 2014, she was crying, upset, and angry while at the Gathering Hope House.  (*Id*.)  She was cooperative with Ms. Sunseri but hostile towards other Gathering Hope House members.  (*Id*.)

Ms. Montanez met with Ms. Sunseri twice in September 2014.  (Tr. 1745-46, 2385-86.)  On September 4, Ms. Sunseri assisted her with paperwork and bills and reviewed her upcoming appointments.  (Tr. 1745.)  It continued to be difficult for Ms. Sunseri to redirect Ms. Montanez.  (*Id*.)  On September 24, Ms. Montanez had increased agitation.  (Tr. 2385.)  Ms. Montanez reported that she quit going to Gathering Hope House and was no longer attending GED classes because a woman there had stolen CDs from her, and she felt that if she saw the woman she was going to "fight her."  (*Id*.)  She also said that other Gathering Hope House members told her they were going to hurt her, and she felt that she was not treated fairly.  (*Id*.)  Ms. Sunseri tried to assist Ms. Montanez with getting required documentation from her landlord.  (*Id*.)

Ms. Montanez returned to Dr. Noveske on September 29, 2014.  (Tr. 2367-68.)  Dr. Noveske said she seemed "to be doing reasonably well."  (Tr. 2367.)  Ms. Montanez said she liked her new apartment and was living with her boyfriend, but she also said her landlady was irritating.  (*Id*.)  She had no vegetative symptoms and reported no suicidal ideation.  (*Id*.)  Ms. Montanez said she was not using Ativan on a daily basis and Dr. Noveske decreased Ms. Montanez's Ativan dose slightly.  (*Id*.)

During October 2014, Ms. Sunseri met with Ms. Montanez to assist her with shopping, paying bills, understanding and reading mail, and making phone calls.  (Tr. 2387-96.)  Ms. Montanez reported she had not returned to Gathering Hope House and was starting to feel better and was less stressed.  (Tr. 2387, 2389.)  She was calm and her symptoms appeared to be in good control.  (Tr. 2389, 2395.)

On November 10, 2014, Ms. Montanez returned to Dr. Noveske.  (Tr. 2369-70.)  She reported she was doing well.  (Tr. 2369.)  She also reported no suicidal ideation and denied problems with her mood.  (*Id*.)  Her boyfriend reported that she had occasional temper issues, but they were "not too severe and [did] not appear to be related to her affective disorder."  (*Id*.)  Dr. Noveske prescribed Ambien in place of Ativan because Ms. Montanez reported that she was only using Ativan for sleep.  (*Id*.)

Ms. Montanez met with Ms. Sunseri in November (Tr. 2397-2400, 2405-06) and Ms. Sunseri and another CPST provider, Linda Avolt, BSW, QMHS, in December 2014 (Tr. 2401-04, 2407-08).  She appeared to be in control of her mental health symptoms.  (Tr. 2397-2408.)

*2015*

On January 12, 2015, Ms. Montanez returned to Dr. Noveske.  (Tr. 2371-72.)  She reported some anxiety and fear about going out on her own.  (Tr. 2371.)  Dr. Noveske decreased Ms. Montanez's Invega dose based on her reports of a tremor.  (*Id*.)  He discontinued Ambien because Ms. Montanez said she did not find it helpful.  (*Id*.)  Ms. Montanez continued to receive CPST services, primarily through Ms. Sunseri, until her next appointment with Dr. Noveske in March 2015.[10]  (Tr. 2422-37.)  Ms. Sunseri accompanied Ms. Montanez on community outings and assisted her with tasks such as paying bills, completing paperwork, reading and understanding mail, and placing calls regarding utilities.  (Tr. 2422, 2424, 2428, 2430, 2432, 2434, 2436.)  Aside from some noted depression after Ms. Montanez made the decision to give her dog up (Tr. 2424), and some reported and observed continued anxiety (Tr. 2428, 2432), Ms. Montanez denied an increase in her mental health symptoms (Tr. 2432).  It was noted that Ms.

---

[10] In addition to meeting with Ms. Sunseri, Ms. Montanez met with Jacqueline Spenzer, QMHS.  (Tr. 2435, 2437.)

Montanez would decompensate without CPST intervention, leading to hospitalization.  (Tr. 2424, 2426, 2428, 2430, 2432.)

Ms. Spenzer accompanied Ms. Montanez to meet with Dr. Noveske on March 12, 2015. (Tr. 2436-37, 2373-74.)  She was doing well and her affect was bright.  (Tr. 2373.)  Her tremor had significantly improved since the Invega dose was lowered.  (*Id*.)  She had not been depressed and had no suicidal ideation.  (*Id*.)  She was "rather socially constricted but did have a relative visit from [out of state] for a week" and the visit went well.  (*Id*.)  Dr. Noveske made no changes to her medication.  (*Id*.)

On March 25, 2015, Ms. Montanez met with Ms. Sunseri and reported an increase in stress and anxiety because she had not heard back from the county regarding her reapplication for benefits.  (Tr. 2438.)  Ms. Sunseri noted that Ms. Montanez's affect was appropriate and she was willing to engage, but she also commented that Ms. Montanez had: a history of manic episodes, difficulty controlling her anger, poor judgment, and lacked impulse control.  (*Id*.)  She further commented that Ms. Montanez appeared to have increased anxiety and continued to get "stressed over and dwell on things that [were] of little importance and not relevant."  (*Id*.)  The following month, Ms. Montanez reported she was relieved that her benefits through the county had been continued.  (Tr. 2440.)  Ms. Sunseri accompanied Ms. Montanez on community outings and assisted her with paying bills and purchasing items within her budget.  (*Id*.)  When Ms. Montanez met with Ms. Sunseri and Erica Westerfield, QMHS, in May and early June, she expressed some worry over her relationship with her boyfriend and her housing situation, but she denied symptoms and was cooperative and engaged.  (Tr. 2442, 2444, 2446, 2448.)

On June 8, 2015, Ms. Montanez returned to Dr. Noveske.  (Tr. 2375-76.)  She was stable and eating and sleeping "reasonably well."  (Tr. 2375.)  She had no suicidal ideation and no

irritability. (*Id.*) She said she was going to have to move because the owner of her house was selling the property. (*Id.*) They were contemplating a move out of state where family lived but had not made a final decision. (*Id.*) Dr. Noveske made no changes to her medications. (*Id.*)

Ms. Montanez continued to meet regularly with her CPST providers in June through her next appointment with Dr. Noveske in October 2015. (Tr. 2450-71.) She reported increased anxiety about trying to find a new place to live. (Tr. 2450, 2452, 2454, 2456, 2458.) Ms. Sunseri discussed with Ms. Montanez that she could look for an apartment, but they agreed that Ms. Montanez would do better in a house because she would not come into contact with neighbors daily. (Tr. 2454.) Ms. Montanez was less anxious after finding a new place to live (Tr. 2460, 2462), but she also reported being unhappy because her neighbors were loud and she wished she had not moved back into an apartment (Tr. 2464, 2466). She reported some issues with her boyfriend and his brother, but she and her boyfriend quickly reunited. (Tr. 2468, 2470.)

Ms. Montanez returned to Dr. Noveske on October 26, 2015. (Tr. 2377-78.) Dr. Noveske commented that Ms. Montanez was "doing reasonably well from a psychiatric vantage point." (Tr. 2377.) She had "[s]ome fragmentation in sleep" and had been overeating, but it did not appear related to depression. (*Id.*) She had no suicidal ideation. (*Id.*) She reported her social security application had been denied twice in the past and she was concerned about her pending disability appeal. (*Id.*) There was no mention of medication changes. (*Id.*)

While Ms. Sunseri was off work in November and December 2015 (Tr. 2276), Ms. Montanez met with Francisco Espinosa, QMHS, for CPST services (Tr. 2472-79). Mr. Espinosa assisted her with going to the bank and store and paying bills. (*Id.*) He also accompanied her to LCCAA regarding her HEAP. (Tr. 2472, 2474, 2478.) Ms. Montanez expressed some irritation

and anger surrounding issues that arose regarding her HEAP paperwork.  (Tr. 2474, 2476, 2478.)

Mr. Epinosa reminded her about coping skills she could use to deal with her frustration.  (*Id*.)

> *2016*

On January 27, 2016, Ms. Montanez returned to Dr. Noveske.  (Tr. 2190-91.)  She was

doing well and was in "good spirits."  (Tr. 2190.)  She denied affective issues since her last

appointment and she had no suicidal ideation.  (*Id*.)  She had no significant vegetative symptoms.

(*Id*.)  Dr. Noveske made no changes to Ms. Montanez's medications.  (*Id*.)

Ms. Montanez met with Ms. Sunseri throughout February and March 2016.  (Tr. 2264-

77.)  In February 2016, Ms. Sunseri noted that Ms. Montanez became easily confused and

lacked social boundaries.  (Tr. 2274, 2276.)  When they met on February 24, 2016, to attend an

event at Gathering Hope House, Ms. Montanez needed some redirection and had some anxiety

about paperwork she received by LCDJFS, but she was in a good mood with an appropriate

affect.  (Tr. 2272.)  In early March 2016, Ms. Sunseri continued to note that Ms. Montanez was

in a good mood with appropriate affect.  (Tr. 2266-69.)  A few weeks later, on March 25, 2016,

Ms. Sunseri observed that Ms. Montanez had manic symptoms—she was talking very loud and

non-stop, she was difficult to redirect, her speech was rapid, and she had racing thoughts.  (Tr.

2264-65.)  She was very irritated with her boyfriend's brother's wife.  (Tr. 2264.)

When Ms. Montanez returned to Dr. Noveske on April 27, 2016, she was "emotionally

stable but discouraged as she was again denied disability."  (Tr. 2188-89.)  She was not

depressed and there were no vegetative symptoms.  (Tr. 2188.)  She said she was planning to

visit her daughter out of state in the summer.  (*Id*.)  Dr. Noveske and Ms. Montanez discussed the

need for Ms. Montanez to take her medication during her out of state visit.  (*Id*.)  Dr. Noveske

made no changes to Ms. Montanez's medications.  (*Id*.)  Ms. Montanez also met with Ms.

34

Sunseri that same day. (Tr. 2262-63.) She reported that Dr. Noveske made no changes, and she was continuing to follow her treatment plan. (Tr. 2262.) She did not understand why she was denied social security disability and said she was considering getting a new attorney to assist her. (*Id.*) Ms. Sunseri encouraged Ms. Montanez to try to return to work because her symptoms had been under control and well-managed with her current medication.[11] (*Id.*) Ms. Montanez said she would return to work, but she did not have transportation. (*Id.*) She reported she was looking forward to her summer trip to visit her family. (*Id.*)

Ms. Sunseri continued to meet with and accompany Ms. Montanez on community outings. (Tr. 2254-61.) During outings at the end of May 2016, Ms. Montanez was anxious about possibly losing cash assistance. (Tr. 2254, 2256, 2258.) She had rapid speech, racing thoughts, and she was difficult to redirect. (*Id.*) Ms. Sunseri assisted Ms. Montanez with managing her appointments and hearings to work on retaining her cash assistance. (*Id.*)

On August 3, 2016, Ms. Montanez met with Ms. Sunseri after returning from her trip to visit her family out of state. (Tr. 2252-53.) She talked a lot about her trip and children. (Tr. 2252.) Ms. Sunseri observed that Ms. Montanez appeared to be in good control of her symptoms, but found it difficult to redirect her. (*Id.*) Ms. Sunseri assisted Ms. Montanez with obtaining updated lease information from her landlord. (*Id.*) When Ms. Montanez met with Ms. Sunseri two weeks later, on August 16, 2016, she was upset about utility bills and Ms. Sunseri observed that Ms. Montanez was "very manic" and in need of "constant redirection." (Tr. 2250-51.) Ms. Montanez still appeared "very manic" when Ms. Sunseri met with her at her home on August 23, 2016. (Tr. 2248-49.) She was crying and yelling and upset with her boyfriend. (Tr. 2248.) She had kicked her boyfriend out, his brother was now living with her, and she had

---

[11] Ms. Sunseri's notes from the April 27, 2016 visit are conflicting in that she also commented that Ms. Montanez appeared to be experiencing a manic period. (Tr. 2262.)

become her boyfriend's brother's authorized representative with job and family services.  (*Id*.)
Ms. Sunseri encouraged Ms. Montanez to take care of herself before trying to take care of other
people.  (*Id*.)  Ms. Montanez reported that her primary care physician had given her anti-anxiety
medication, but she was not taking it because a nurse told her the medication could interact with
some of her other medication.  (*Id*.)

On August 30, 2016, a crisis assessment was conducted by Mary Jo Arabian, LSW, at
Ms. Montanez's home, with the police present, due to possible decompensation after she called
the Nord Center hotline.  (Tr. 2340-45.)  During her call to the hotline, she said she was being
threatened by her boyfriend's family; she presented as angry, agitated, and paranoid; and she was
not directable or responsive to questions.  (Tr. 2340.)  When assessed, Ms. Montanez was
cooperative.  (Tr. 2341.)  Her mood was appropriate, and her affect was full.  (*Id*.)  Her thought
content and speech were normal, and her thought processes were intact.  (Tr. 2341-42.)  No
delusions or hallucinations were evident, but it was noted that she had a history of auditory
hallucinations "commandeering her to kill her neighbor."  (Tr. 2342.)  Her memory was fair.
(*Id*.)  Her eye contact was average.  (*Id*.)  She had a history of impulsivity.  (*Id*.)  She had limited
insight and poor judgment.  (*Id*.)  She reported no suicidal or homicidal ideations.  (*Id*.)  She was
scheduled to meet with Ms. Sunseri and Dr. Noveske the next day.  (Tr. 2343-44.)  LSW Arabian
determined that Ms. Montanez did not require a higher level of care at that time.  (Tr. 2344.)

Ms. Montanez saw Dr. Noveske on August 31, 2016.  (Tr. 2186-87.)  Dr. Noveske noted
that Ms. Montanez had stopped taking Invega a few weeks earlier because she said it was
causing "seizures."  (Tr. 2186.)  She appeared significantly hypomanic.  (*Id*.)  Dr. Noveske could
not "elicit flagrant psychosis," but noted there was "a paranoid twinge to her thinking and her
sleep ha[d] deteriorated."  (*Id*.)  She denied depression and suicidal or homicidal ideation.  (*Id*.)

36

Ms. Montanez was initially unwilling to start any new medication, but then agreed to start Zyprexa.  (*Id*.)  She also agreed to continue Remeron because she felt it was helping.  (*Id*.)  She said she might want to stop treatment at the Nord Center and start at the Cleveland Clinic, but agreed to see Dr. Noveske in two weeks for follow up.  (*Id*.)  Dr. Noveske did not feel she was committable at that time, but felt that her symptoms were starting to be similar to those she had when she was previously admitted.  (*Id*.)  He hoped that Zyprexa would be adequate.  (*Id*.)  After her appointment with Dr. Noveske, Ms. Montanez stopped Ms. Sunseri at the office and told her that Dr. Noveske wanted to hospitalize her.  (Tr. 2246-47.)  Ms. Sunseri observed that Ms. Montanez continued to be "extremely manic."  (Tr. 2246.)  She was "[p]acing around the parking lot, talking loudly" and was "increasingly difficult to redirect."  (*Id*.)

On September 6, 2016, Ms. Sunseri met went with Ms. Montanez to pay her rent and look for a new apartment.  (Tr. 2244-45.)  Ms. Montanez continued to appear "very manic."  (tr. 2244.)  She was tearful throughout their meeting.  (*Id*.)  She reported she kicked her brother-in-law out to return to the nursing home because it was too much for her to care for him.  (*Id*.)  She also reported that she and her daughter had an argument and were no longer speaking.  (*Id*.)

On September 12, 2016, Ms. Montanez returned to Dr. Noveske.  (Tr. 2184-85.)  She was doing better and her sleep had improved.  (Tr. 2184.)  She was less hypomanic than she was during her last visit.  (*Id*.)  She was unhappy about her current living situation and hoped to move soon.  (*Id*.)  Her medications included Zyprexa, Remeron, and Buspar.  (*Id*.)  Dr. Noveske changed the dosing schedule for Buspar.  (*Id*.)  Otherwise, no changes were made to Ms. Montanez's medications.  (*Id*.)

On September 13, 2016, Ms. Sunseri saw Ms. Montanez walking on the street.  (Tr. 2240.)  Ms. Montanez said she was on her way to the police station to file charges against people

who were harassing her.  (*Id*.)  Ms. Sunseri asked her about a voicemail she received from Ms.

Montanez's landlord, indicating that Ms. Montanez has been chasing people around the

apartment with a machete.  (Tr. 2240.)  Ms. Montanez laughed about it and said she had done it

as a dare.  (*Id*.)  Ms. Sunseri talked with Ms. Montanez about her poor judgment and the need to

make better decisions.  (*Id*.)  Ms. Montanez said she thought people at Gathering Hope House

were being mean to her and that she might stop going there.  (*Id*.)

A few days later, on September 15, 2016, Ms. Montanez was admitted to Mercy Regional

Medical Center for a manic relapse; she was threatening to stab her boyfriend and was suicidal.

(Tr. 1822-27.)  On admission, she was restarted on Buspar and Zyprexa.  (Tr. 1822.)  Remeron

was discontinued, and Trileptal was started.  (*Id*.)  With medication, her symptoms improved.

(*Id*.)  She was discharged in stable condition on September 21, 2016, with "[n]o agitation noted

upon discharge except for one argument with another patient."  (*Id*.)

Ms. Montanez met with Ms. Sunseri on September 23, 2016.  (Tr. 2239-40.)  She

reported she was getting along better with her boyfriend but planned to live with another man

who was a friend.  (Tr. 2239.)  She made jokes about her illness and recent hospitalization.  (*Id*.)

She continued to be "very manic, yelling and screaming."  (*Id*.)  She tried to get Ms. Sunseri to

stop the car so she could confront a man on a bicycle that she said owed her money, and once

they arrived at a store, she jumped out of the car and aggressively approached a man and accused

him of threatening her boyfriend.  (*Id*.)  Ms. Sunseri was able to redirect Ms. Montanez and

discussed appropriate behaviors with her.  (*Id*.)

When Ms. Montanez met with Ms. Sunseri again on September 28, 2016, she was

"extremely manic."  (Tr. 2236-37.)  She was screaming and yelling and thought she was in

danger and that people wanted to kill her.  (Tr. 2236.)  On September 28, 2016, Ms. Montanez

38

also met with Brenda Alexander-O'Neil, MSN, PMHNP-BC, at the Nord Center for follow up after her recent discharge from the hospital.  (Tr. 2182-83.)  During that visit, she was manic and aggressive, and said neighbors were trying to kill her.  (Tr. 2182.)  She laughed inappropriately and had racing thoughts and pressured speech.  (*Id*.)  She made threats against several providers, neighbors, and the police.  (*Id*.)  She talked non-stop and used racial slurs.  (*Id*.)  NP Alexander-O'Neil had to redirect Ms. Montanez and tell her to stop using inappropriate language.  (*Id*.)  She admitted to being paranoid and also admitted to smoking marijuana daily.  (*Id*.)

On October 14, 2016, Ms. Sunseri met Ms. Montanez at her home.  (Tr. 2234-35.)  When she arrived, Ms. Montanez was crying and said she and her boyfriend had gotten into a fight the night before.  (Tr. 2234.)  She said the police were called and threatened to arrest her.  (*Id*.)  Ms. Sunseri went with Ms. Montanez to look at an apartment Ms. Montanez wanted to rent.  (*Id*.)

On October 24, 2016, Ms. Montanez returned to Dr. Noveske.  (Tr. 2180-81.)  She appeared "modestly hypomanic."  (Tr. 2180.)  Her medications after her recent hospitalization included Zyprexa, Remeron, and Buspar.  (*Id*.)  She was also prescribed Trileptal, but she was not taking it.  (*Id*.)  She said her sleep and appetite were less than normal.  (*Id*.)  Dr. Noveske increased Ms. Montanez's Zyprexa dose and made no changes to Remeron and Buspar.  (*Id*.)  During visits with Ms. Sunseri and other CPST providers at the end of October and in November 2016 (Tr. 2214-33),[12] Ms. Montanez was manic, paranoid, and delusional (Tr. 2224, 2226).  She thought neighbors were trying to kill her.  (Tr. 2224, 2226, 2228.)  She was talkative, anxious, disorganized, and had problems staying on task.  (Tr. 2228, 2230.)  She needed to be redirected multiple times.  (Tr. 2220, 2226, 2228.)

---

[12] CPST services were also provided to Ms. Montanez during this period by Rosa Battaglia, LPN (Tr. 2228-31) and Ms. Bielawski (Tr. 2232-33).

On November 30, 2016, Ms. Montanez returned to Dr. Noveske.  (Tr. 2178-79.)  She reported that she had reunited with her boyfriend.  (Tr. 2178.)  The higher dose of Zyprexa was helping with her sleep, but she was still "somewhat hypomanic."  (*Id*.)  Her appetite was normal.  (*Id*.)  She had no suicidal ideation.  (*Id*.)  Dr. Noveske made no medication changes.  (*Id*.)

When Ms. Montanez met with Ms. Sunseri on December 16, 2016, she said she was doing well and denied any issues.  (Tr. 2304-05.)  She had applied for a job at Little Ceasars.  (Tr. 2304.)  Ms. Sunseri noted that Ms. Montanez had better control of her symptoms.  (*Id*.)

*2017*

Ms. Montanez continued to receive CPST services through the Nord Center during 2017.  (Tr. 2198-99, 2280-2303, 2480-97, 2500-23.)  She met with Ms. Sunseri and Josue Soto, B.A.  (*Id*.)  They continued to: meet with Ms. Montanez at her home; accompany her on community outings; and provide supportive listing and feedback regarding her concerns.  (*Id*.)  At times, Ms. Montanez denied mental health symptoms or concerns (Tr. 2288, 2296, 2510, 2512, 2513, 2523), reported medication compliance (Tr. 2296), and appeared in good control of her symptoms (Tr. 2292, 2300).  But it was also noted that she had delays in perception, often misinterpreted what people were saying or doing, lacked impulse control, and needed to be redirected.  (Tr. 2280, 2294, 2482, 2484, 2488, 2504, 2508, 2514, 2517.)

Ms. Montanez also continued to return to Dr. Noveske for medication management in 2017, with appointments in March (Tr. 2278-79), June (Tr. 2379-80), September (Tr. 2381-82), and December (Tr. 2383-84).  She was stable and doing well throughout 2017 from a psychiatric standpoint and Dr. Noveske made no changes to Ms. Montanez's medications.  (Tr. 2278, 2379, 2381, 2383.)

2.      **Opinion Evidence**

i.      **Treating Sources**

*Dr. Abraham*

Dr. Abraham, who treated Ms. Montanez in 2009 and 2010, completed an Ohio Job &
Family Services Mental Functional Capacity check-box style form, rating Ms. Montanez's work-
related abilities.[13]  (Tr. 1129-30.)  Dr. Abraham opined Ms. Montanez was *markedly* limited in
the following abilities: maintain attention and concentration for extended periods; and work in
coordination with or in proximity to others without being distracted by them.  (Tr. 1129.)  Dr.
Abraham opined that Ms. Montanez was *moderately* limited in the following abilities: remember
locations and work-like procedures; understand and remember detailed instructions; carry out
detailed instructions; perform activities within a schedule, maintain regular attendance, and be
punctual within customary tolerances; sustain an ordinary routine without special supervision;
complete a normal workday and workweek without interruptions from psychologically based
symptoms and perform at a consistent pace without an unreasonable number and length of rest
periods; and accept instructions and respond appropriately to criticism from supervisors.  (*Id*.)
Dr. Abraham opined that Ms. Montanez was not significantly limited in the following abilities:
understand and remember very short and simple instructions; carry out very short and simple
instructions; ask simple questions or request assistance; get along with coworkers or peers
without distracting them or exhibiting behavioral extremes; be aware of normal hazards and take
appropriate precautions; and travel in unfamiliar places or use public transportation.  (*Id*.)  Dr.
Abraham did not provide ratings in the following abilities: make simple work-related decisions;

---

[13] The available ratings were "not significantly limited," "moderately limited," "markedly limited," and "not rated."
(Tr. 1129.)  The opinion notes that Dr. Abraham last examined Ms. Montanez on November 11, 2009, but it is not
clear that the opinion was completed or signed on that date.  (*Id*.)

interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (*Id*.)

Dr. Abraham also checked boxes indicating that Ms. Montanez was unemployable and that her limitations were expected to last between 9 and 11 months.  (Tr. 1129.)  He wrote that Ms. Montanez had the following diagnoses: bipolar disorder, Type I and heroin and cocaine dependence in full remission.  (Tr. 1130.)

### *Dr. Gomes*

Dr. Gomes, who treated Ms. Montanez in 2010 and 2011, rated Ms. Montanez's work-related abilities, using the same Ohio Job & Family Services Mental Functional Capacity form that Dr. Abraham completed.[14]  (*Compare* Tr. 2604-05 *with* Tr. 1129-30.)  Dr. Gomes opined Ms. Montanez was *markedly* limited in the following abilities: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 2604.)  Dr. Gomes opined that Ms. Montanez was *moderately* limited in the following abilities: understand and remember very short and simple instructions; understand and remember detailed instructions; make simple work-related decisions; maintain socially appropriate behavior and adhere to basic standards of

---

[14] The opinion notes that Dr. Gomes last examined Ms. Montanez on March 16, 2011, but it is not clear that the opinion was completed or signed on that date.  (Tr. 2604.)

neatness and cleanliness; and be aware of normal hazards and take appropriate precautions.  (*Id*.)

Dr. Gomes opined that Ms. Montanez was not significantly limited in the following abilities:

remember locations and work-like procedures; carry out very short and simple instructions;

perform activities within a schedule, maintain regular attendance, and be punctual within

customary tolerances; sustain an ordinary routine without special supervision; travel in

unfamiliar places or use public transportation; and set realistic goals or make plans

independently of others.  (*Id*.)  Dr. Gomes did not rate Ms. Montanez's ability to respond

appropriately to changes in the work setting.  (*Id*.)

Dr. Gomes checked a box indicating that Ms. Montanez's limitations were expected to

last 12 months or more.  (Tr. 2604.)  He wrote that Ms. Montanez was diagnosed with bipolar

disorder, Type I, and also that: "Patient is not taking her medication as prescribed due to her

paranoid delusion."  (Tr. 2605.)

### Dr. Saini

On August 23, 2021, Dr. Saini, who treated Ms. Montanez from April 2011 to November

2011, completed a check-box style Medical Source Statement Concerning the Nature and

Severity of an Individual's Mental Impairment.[15]  (Tr. 1261-62.)  He wrote that Ms. Montanez

was diagnosed with bipolar I disorder and mood disorder, NOS.  (Tr. 1262.)  He opined that Ms.

Montanez had *extreme* limitations in her ability to: interact appropriately with others (e.g.,

public, supervisors, coworkers).  (Tr. 1261.)  He opined that Ms. Montanez had *marked*

limitations in her ability to: keep a regular work schedule and maintain punctual attendance;

withstand the stresses and pressures of routine simple unskilled work; and make judgments that

are commensurate with the functions of unskilled work, i.e., make simple work-related decisions.

---

[15] The available ratings were "less than moderate," "moderate," "marked," and "extreme."  (Tr. 1261-62.)

(Tr. 1261-62.)  He opined that Ms. Montanez had *moderate* limitations in her ability to: remember, understand, and follow simple directions; maintain attention and concentration for two-hour periods at a time; and perform work activities at a reasonable pace.  (Tr. 1261.)

### *Dr. Noveske*

On February 28, 2018, Dr. Noveske, who treated Ms. Montanez from 2012 to 2017, completed a check-box style Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment.  (Tr. 2529-31.)

As to cognitive abilities, Dr. Noveske opined that Ms. Montanez's ability to understand, remember, and follow instructions was functionally impaired.  (Tr. 2529.)  Specifically, he opined that Ms. Montanez could consistently understand, remember, and follow simple one- or two-step instructions, but could not consistently understand, remember, and follow multi-step instructions.  (*Id*.)

As to focus and concentration, Dr. Noveske opined that Ms. Montanez's ability to concentrate over the course of an 8-hour workday was functionally impaired.  (Tr. 2529.)  Specifically, he expected Ms. Montanez would "be unable to persist and stay on task because of impaired concentration" for an average of 10% or less during an 8-hour workday.  (*Id*.)

As to social limitations, Dr. Noveske opined that Ms. Montanez's ability to consistently and appropriately engage in social interactions was functionally impaired.  (Tr. 2529.)  Specifically, he opined that Ms. Montanez's ability to engage in social interactions independently, appropriately, effectively, and on sustained basis was "seriously limited," indicating that she could not consistently and appropriately: respond to ordinary instruction and criticism from supervisors; work around coworkers without causing interpersonal conflicts;

engage in superficial public interactions; or persuade, resolve conflict, negotiate, or give direction to others.  (*Id.*)

As to adapting and managing oneself, Dr. Noveske opined that Ms. Montanez's ability to adapt and manage herself in a work setting was functionally impaired.  (Tr. 2530.)  Specifically, he opined that she could not generally manage the stress of day-to-day demands of simple and routine tasks, such as regulating emotions, controlling behavior, or maintaining well-being.  (*Id.*)

When asked to explain how the opined limitations were supported by clinical findings, Dr. Noveske wrote:

> Ms. Montanez has periods of stability, however, they are not consistent or sustained. When [symptoms] arise, she becomes hostile, manic, aggressive, socially & inappropriate. She is unable to maintain boundaries, uses poor judgment, has mood swings, is unable to concentrate, requires constant redirection, is unable to remember tasks, lacks ability to problem solve difficulty, dealing with stressful situations, has delusional thoughts, paranoid & lacks impulse control. Some [symptoms] are present with stability, however, appear less extreme during these periods.

(Tr. 2530.)  When asked whether the limitations lasted or were expected to last at least 12 months, Dr. Noveske wrote: "[Ms. Montanez] has periods of stability, however, they are not consistent."  (*Id.*)  He noted that he first saw Ms. Montanez in January 2012, and last saw her in December 2017, and indicated that her symptoms had been present since at least the date he first saw her.  (*Id.*)

### ii.    Consultative Examiner

On May 16, 2013, Ms. Montanez presented to consultative psychologist James N. Spindler, M.S., for a psychological evaluation.  (Tr. 1550-56.)  Her Nord Center case manager brought her to the evaluation. (Tr. 1551.)  Ms. Montanez said she was applying for disability benefits because she had "a lot of PTSD and stress."  (Tr. 1550.)  She reported that she last

worked in 2006.  (Tr. 1552.)  Regarding her past employment, she said she did not know how her past employers would rate her job performance, and that she did not get along with others.  (*Id*.)

On mental status examination, Ms. Montanez was dressed appropriately and appeared to have average grooming habits.  (Tr. 1553.)  She was cooperative and spoke clearly at a normal rate and volume.  (*Id*.)  She did not appear to have difficulty staying focused during the interview.  (*Id*.)  She did not ramble; she provided coherent and relevant answers to questions; and her thought associations were adequate with no fragmentation of thought or flight of ideas.  (*Id*.)  However, she was not talkative and appeared stressed during the interview.  (*Id*.)

Ms. Montanez reported no problems sleeping but reported having nightmares.  (Tr. 1553.)  She described her energy level as average and said she did not take naps.  (*Id*.)  She reported that her relationship with her boyfriend was going well.  (*Id*.)

Ms. Montanez did not appear depressed and denied feeling depressed during the interview, but she reported having frequent mood swings and said that feelings of depression were common to her.  (Tr. 1553.)  She reported that she worried a lot and always felt a sense of anxiety, and said there were times when she experienced increased levels of stress, especially if she was in conflict with another person.  (*Id*.)  She appeared to recognize that her reactions were extreme or inappropriate at times.  (*Id*.)  While she could go out into the community if she had to, she said she preferred to have someone with her when she left her apartment.  (*Id*.)

Ms. Montanez was alert, knew the date, and was oriented to place and person.  (Tr. 1554.)  She could recall five of five objects after five minutes and could accurately recite three digits forward and two digits backwards.  (*Id*.)  She appeared to be functioning in the average range of intelligence.  (*Id*.)  Mr. Spindler felt Ms. Montanez's level of knowledge was adequate

for most aspects of daily living and indicated that her judgment appeared reliable for most routine matters. (*Id*.)

Mr. Spindler opined that Ms. Montanez seemed "capable of understanding, remembering and carrying out instructions in most job settings," (Tr. 1555), but he also opined that, given Ms. Montanez's bipolar disorder, she seemed "unlikely to have the ability to sustain her attention and concentration for long periods of time" (Tr. 1556). Mr. Spindler opined that Ms. Montanez seemed "unlikely to respond appropriately to supervision and to coworkers," noting that she said she did not know how past employers would rate her job performance and never got along very well with people that she worked with. (*Id*.) Finally, Mr. Spindler opined: "Based on clinical observations and what . . . [Ms. Montanez] . . . told . . . [him], [Ms. Montanez] appear[ed] to be handling the current stressors in her life only moderately well" and "[i]t seem[ed] likely that [Ms. Montanez] [would] have a problem with handling even the routine stressors of competitive employment." (*Id*.)

### iii. State Agency Psychological Consultants

*2010 Opinions*

On March 11, 2010, state agency psychological consultant Cynthia Waggoner, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 1091-1104) and a mental RFC assessment (Tr. 1105-08). In the PRT, Dr. Waggoner opined that Ms. Montanez had mild restrictions in her activities of daily living; mild difficulties in her ability to maintain social functioning; moderate difficulties in her ability to maintain concentration, persistence, or pace; and no episodes of decompensation. (Tr. 1101.) In her mental RFC assessment, Dr. Waggoner opined that Ms. Montanez retained the ability to perform simple and routine tasks in a static environment with limited social contact. (Tr. 1107.)

On August 13, 2010, state agency psychological consultant Steven J. Meyer, Ph.D., affirmed Dr. Waggoner's findings upon reconsideration.  (Tr. 1150.)

*2013 Opinions*

On June 14, 2013, state agency psychological consultant Bonnie Katz, Ph.D., completed a PRT (Tr. 212-13) and a mental RFC assessment (Tr. 216-18).  In the PRT, Dr. Katz opined that Ms. Montanez had moderate restrictions in her activities of daily living; moderate difficulties in her ability to maintain social functioning; moderate difficulties in her ability to maintain concentration, persistence, or pace; and no episodes of decompensation.  (Tr. 212.)  In her mental RFC assessment, Dr. Katz opined that Ms. Montanez did not have understanding or memory limitations, and would be able to understand, remember, and carry out instructions.  (Tr. 216.)  Dr. Katz opined that Ms. Montanez had the following limitations in sustained concentration and persistence: marked limitations in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and moderate limitations in her ability to maintain attention and concentration for extended period, maintain regular attendance, or work in coordination or proximity with others without being distracted by them.  (Tr. 217.)  She explained that Ms. Montanez had mood swings and a sense of anxiety, and opined that her symptoms of anxiety and bipolar disorder would make it difficult for her to sustain activities over time.  (*Id*.)  Dr. Katz opined that Ms. Montanez had the following social interaction limitations: marked limitations in her ability to interact appropriately with the general public; and moderate limitations in her ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, or get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 217.)  Dr. Katz

explained that Ms. Montanez was limited due to mood swings and anxiety.  (*Id*.)  Finally, Dr. Katz opined that Ms. Montanez had the following adaptation limitations: marked limitations in her ability to respond appropriately to changes in the work setting.  (Tr. 218.)  She explained that Ms. Montanez's symptoms of anxiety and mood swings would make adaptation to work stressors difficult.  (*Id*.)

On August 27, 2013, state agency psychological consultant Patricia Semmelman, Ph.D., did not affirm Dr. Katz's findings upon reconsideration.  (Tr. 227-28, 232-34.)  In the PRT, Dr. Semmelman opined that Ms. Montanez had: mild restrictions in her activities of daily living; moderate difficulties in her ability to maintain social functioning; moderate difficulties in her ability to maintain concentration, persistence, or pace; and no episodes of decompensation.  (Tr. 227.)  In the mental RFC assessment, Dr. Semmelman opined that Ms. Montanez could:

> interact occasionally and superficially and receive instructions and ask questions appropriately in a smaller or more solitary and less public to nonpublic work setting.  She [could] cope with the ordinary and routine changes in a work setting which is not fast paced or strict time or production requirements.

(Tr. 234.)

### *2017 Opinions*

On April 5, 2017, state agency psychological consultant Bruce Goldsmith, Ph.D., completed a PRT (Tr. 331-32) and a mental RFC assessment (Tr. 336-38).  In the PRT, Dr. Goldsmith opined that Ms. Montanez had moderate limitations in her ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  (Tr. 332.)  In his mental RFC assessment, Dr. Goldsmith opined that Ms. Montanez could: understand, remember, and carry out simple instructions; maintain concentration, persistence, and pace for routine tasks; interact occasionally with coworkers and

supervisors, but not with the general public; and would be limited to routine type work with few changes.  (Tr. 336-38.)

Upon reconsideration, on May 31, 2017, state agency psychological consultant Lisa Foulk, Psy.D., affirmed Dr. Goldsmith's findings.  (Tr. 348-49, 352-55.)

### C.     Hearing Testimony

#### 1.      Plaintiff's Testimony

Plaintiff's testimony from the three administrative hearings held in this matter is summarized below.

##### i.      September 7, 2011 Hearing

At the September 7, 2011 hearing, Ms. Montanez testified in response to questioning by the ALJ and her representative.  (Tr. 174-97.)  She said her driver's license expired in 2008 and she did not renew it because she would have to retake her driver's test.  (Tr. 175.)

She had been seeing her treating psychiatrist Dr. Stein every one or two months since March of 2011.[16]  (Tr. 178, 185.)  She also met with her case manager every week to two weeks; her case manager helped her fill out paperwork and asked her questions.  (Tr. 185-86.)  She was prescribed Xanax and Risperdal and had been taking both prescriptions for "some time."  (*Id.*)  She said it was harder for her to concentrate with the medications she was taking.  (Tr. 179.)  She could not concentrate on television programs or books; her mind just went "blank" when she tried to concentrate on television.  (Tr. 183, 196.)  She denied having that problem when she was doing things like laundry, grocery shopping, cooking, or taking a bath or shower.  (Tr. 197.)

---

[16] Although the hearing transcript reflects that one of Ms. Montanez's doctors was Dr. Stein, Ms. Montanez was likely referring to Dr. Saini, who treated her for a few months in 2011.  (Tr. 1260-62, 1295-1302.)

Ms. Montanez reported that her mood swings and seizures prevented her from working full-time.  (Tr. 177.)  Her mood swings made it hard for her to get along with other people.  (Tr. 179.)  She got angry a lot, especially in the winter.  (*Id*.)  She could not explain why her anger was worse in the winter, but said she was more manic in the winter.  (*Id*.)  She reported not getting along with her neighbors, explaining that they called the police on her for playing music at 4:00 p.m.  (Tr. 183.)  When the police arrived at her home, they talked to her and her neighbors and concluded that her music was not that loud.[17]  (Tr. 183, 185.)  She said she was kicked out of the Gathering Hope House and was not allowed to use their transportation services from October 2010 through about April 2011 because she was getting in arguments and was told she was too loud.  (Tr. 180-81.)  She reported taking her medication as prescribed at that time, but said she had anxiety that caused her heart to race "really fast," caused her to have racing thoughts, and prevented her from sleeping.  (Tr. 181-82.)  Her treatment providers recommended a Risperdal shot to better control her symptoms.  (Tr. 182.)  She agreed to the shot once but then refused because the shot made her sleep a lot and affected her concentration.  (*Id*.)  She reported that she still took Risperdal in pill form; it made her sleepy, but Risperdal and Xanax controlled her "moods more than usual" (Tr. 182, 184) and made her much calmer (Tr. 184).

Ms. Montanez said she got along well with family, but she was shy around strangers.  (Tr. 190-91.)  She lived on her own in an apartment.  (Tr. 189.)  She was independent in taking care of household chores and her personal hygiene.  (*Id*.)  She could shop on her own, but she needed to ask someone for a ride.  (Tr. 189-90.)  She filled her day with cleaning, cooking, and watching television.  (Tr. 188.)  She typically watched cartoons or judge or court shows.  (Tr. 188, 190.)  She used to go to the Gathering Hope House to volunteer in the kitchen or play bingo

---

[17] She said her neighbors also got upset with her if she had people over because her neighbors felt that her visitors were taking up their parking spots.  (Tr. 191.)

in 2007, but no longer did that. (Tr. 188-89.) She last worked as a cashier at McDonald's in 2006. (Tr. 193-94.) She said she stopped working there because she was not being paid for all her hours and her manager was "giving [her] cash register to other people" and she did not "want to be responsible if anything was missing from it . . .." (Tr. 194.)

### ii. October 6, 2014 Hearing

At the video hearing conducted on October 6, 2014, Ms. Montanez testified in response to questioning by the ALJ and her representative. (Tr. 133-57.) Ms. Montanez was seeing Dr. Noveske, a psychiatrist at the Nord Center.[18] (Tr. 146-47, 154.) Ms. Montanez testified to seeing other psychiatrists at the Nord Center before Dr. Noveske. (Tr. 153-54.) She also had a case manager at the Nord Center who helped her with things like picking up her medication and filling out paperwork. (Tr. 147-48.) She saw Dr. Noveske every two months, and she met with her case manager every week. (Tr. 148.) She filled her pill box on a weekly basis, every Sunday, and had a Care Source nurse that came to her home every 90 days to check her medications and provide her with pill reminders. (Tr. 149-50.)

Ms. Montanez had been living in a house with her boyfriend since August 2014. (Tr. 134.) She found the house with the help of her case manager. (Tr. 134-35.) Her case manager also helped her fill out paperwork that was required in order for her to receive assistance from various agencies, such as food stamps and Medicaid. (Tr. 135-39.) She received money from welfare to assist with payment of her utility bills. (Tr. 141.) When she received that money, she paid her utility bills at a convenience store that accepted utility payments. (Tr. 141-44.) She walked to the store, which was about a half mile from her home. (Tr. 142-43.) On occasion,

---

[18] The hearing transcript states that her treatment was at the "North" Center (Tr. 146), however, other record evidence reflects that Dr. Noveske was affiliated with the Nord Center (Tr. 2529).

individuals approached her when she was walking to the store, and it caused her to be afraid; when that happened, she would walk away. (Tr. 143-44.)

When asked what prevented her from working, Ms. Montanez said she had a lot of pain in her back and hands, and her medication made her drowsy and unable to concentrate. (Tr. 150.) She also said she had problems getting along with other people (Tr. 155), and had anxiety and was depressed at times, especially in August because that was the anniversary of a traumatic event that occurred in August 2006 (Tr. 156). She had problems keeping track of her schedule even when she wrote things down. (Tr. 156-57.) She was able to clean her house on her own and did so daily. (Tr. 157.)

### iii. March 21, 2018 Hearing

At the video hearing conducted on March 21, 2018, Ms. Montanez testified in response to questioning by the ALJ and her representative. (Tr. 101-05, 107, 109-10.) She could not recall how long it had been since she had symptoms that resulted in her feeling like she was not in control, but she sometimes did not know or remember doing certain things; she only knew she did them because people told her about it. (Tr. 101.) She felt that her case manager helped her because she kept her "from telling people all [her] business, and she help[ed] [her] remember what [she] need[ed] to get." (Tr. 101-02.) She tended to say too much or to say inappropriate things even when her symptoms were stable, so her case manager helped her guide her conversations. (Tr. 102.)

Ms. Montanez also said that she did not know what she was doing when she was manic, which was affecting her relationship with her family. (Tr. 104.) Her family only recently started to call her again after cutting off contact with her for almost an entire year. (Tr. 104-05.) And

even though they had started to communicate with her again, she said that it was not like it used to be. (Tr. 105.)

Ms. Montanez said her last job, which was at a fast-food restaurant, was the longest job she had worked. (Tr. 109-10.) She worked there for about six months and lost it because she was arrested; she could not recall why she was arrested. (Tr. 110.)

### 2. Case Manager Testimony

Ms. Montanez's case manager at the Nord Center Kelli Sunseri testified at the March 21, 2018 hearing. (Tr. 81-100.) Ms. Sunseri had been Ms. Montanez's case manager since the end of 2009 / beginning of 2010. (Tr. 81.) As Ms. Montanez's case manager, Ms. Sunseri assisted Ms. Montanez with "community outings, reading, understanding mail that she receive[d], completing paperwork, [and] redirecting inappropriate behaviors." (Tr. 82.) She also assisted her with obtaining entitlements like cash assistance, food stamps, and Medicaid. (*Id*.) Ms. Sunseri felt that Ms. Montanez was "very good at keeping her appointments." (Tr. 99.)

Ms. Sunseri met Ms. Montanez a couple of times each year in the office, but most of her interactions with Ms. Montanez occurred out of the clinical setting. (Tr. 96-97.) At the time of the hearing, Ms. Sunseri was seeing Ms. Montanez at least once a month because she was stable. (Tr. 97, 99.) She said it was the longest period of stability that she had seen Ms. Montanez have. (Tr. 98.) During Ms. Montanez's manic periods, which could last for months (Tr. 100), Ms. Sunseri would see her "every week to every day" (Tr. 97). Ms. Sunseri said she did not know what triggered Ms. Montanez's periods of mania and could not predict when Ms. Montanez would have manic symptoms. (Tr. 98-99.)

Ms. Sunseri said Ms. Montanez also had a hard time remembering things and had a "very difficult time with social boundaries," and was unable to control her impulsiveness at times. (Tr.

54

82.)  She said Ms. Montanez needed "redirection out in the community" and "reminders on social boundaries on how to be appropriate when" she was out.  (Tr. 85-86.)  With respect to her need for help with social boundaries, Ms. Sunseri explained:

> So she just doesn't, at times, not all the time, at times she doesn't fully understand, you know, the appropriateness out in the community, you know, that you aren't supposed to be yelling and running and talking to everybody and, and telling, you know, the cashier everything that's happening at your house and what's going on with your landlord and your other tenants.
>
> And, you know, so just like redirection on like those kind of things.  Okay, Sandra, we don't need to explain our whole life story to everybody, and we don't need to go up and talk to every person that we see and tell them everything, so that kind of thing.  Just kind of, you know, bringing her back in and, and kind of getting the task that we need to complete completed without all these other things going on.

(Tr. 86-87.)  At times, Ms. Sunseri reported that Ms. Montanez could be irritable and aggressive towards others.  (Tr. 88.)  At other times, she would share too much personal information with others.  (*Id*.)  When Ms. Montanez experienced her "mania and her mental health symptoms," Ms. Sunseri explained that her impulsiveness occurred not just in community settings, but also at home, with her landlord, boyfriend, and neighbors.  (Tr. 87.)  She reported that Ms. Montanez had been removed from doctors' offices and the Gathering Hope House—a place where mental health clients could go for daytime activities and social interaction—because she could not control herself.  (Tr. 87-90, 96.)

Ms. Sunseri said she had been called by several of Ms. Montanez's landlords regarding Ms. Montanez's behavior, and Ms. Montanez had been evicted due to issues with her behavior.  (Tr. 90, 98.)  Ms. Sunseri was also aware that restraining orders had been obtained by Ms. Montanez's neighbors against Ms. Montanez.  (Tr. 90.)

Ms. Sunseri described Ms. Montanez's symptoms when she was in a manic state as: "[V]ery rapid speech, racing thoughts, pressured speech.  She's grandiose in her thinking.  Very

impulsive.  She has, you know, mood swings, she'll be happy and then periods of depression.

Almost like an inability to control herself at all, erratic behaviors." (Tr. 91.)  Ms. Sunseri

testified that she felt Ms. Montanez's manic symptoms had impacted her interpersonal

relationships.  (*Id*.)  About two years earlier, Ms. Sunseri reported that Ms. Montanez's

symptoms had lasted the longest and been some of the worst symptoms she had seen.  (*Id*.)

During that time period, Ms. Montanez lost contact with all of her children.  (*Id*.)  Ms. Montanez

had visited with family in Florida shortly before, and everything seemed to be going well.  (*Id*.)

But just about two months after that visit, Ms. Montanez's behavior "caused enough damage in

the family relationships to where none of her children were speaking to her." (*Id*.)   Ms. Sunseri

could not recall exactly what Ms. Montanez did to damage the relationships, but Ms. Montanez

told her "she had posted some things on social media and made phone calls and threats" that

were apparently "substantial enough to where . . . her family is very loving and caring and

always there for her to where they cut contact with her for a significant amount of time." (Tr.

91-92.)  Ms. Sunseri had not spoken with Ms. Montanez's family regarding the matter.  (Tr. 92.)

Ms. Montanez showed Ms. Sunseri some of the social media posts, but also told her she did not

know how the posts got there.  (Tr. 92-93.)  Ms. Sunseri indicated it was not uncommon for Ms.

Montanez not to recall things that she did or said when she was in a manic state.  (Tr. 93-96.)

Ms. Sunseri believed that Ms. Montanez still needed the services provided by the Nord

Center even during her periods of stability, explaining:

> [W]e will continue to monitor her.  That's why I said like -- we dropped down
> service, I only see her once a month now as opposed to seeing her more frequent.
> So we continue to see her so that her symptoms don't become severe.  We are
> hoping that what we're doing, you know, with the making sure she gets all the
> place[s] that,  that she needs and not, you know, allow her to have as many stressors
> as to how am I going to get here, how am I going to get food, and what's going on
> with my medical, kind of helping he[r] with that.  We hope that that is going to be
> able to help her maintain stability.  So in that sense I feel that she does still need . .

56

. our services . . . in order to maintain the stability is the hope.  She might not need as intensive services as she does when she is having her periods of mania, but I feel, I feel it is beneficial.

(Tr. 99.)  Ms. Sunseri relayed that Dr. Noveske had very recently retired so Ms. Montanez would be getting a new psychiatrist.  (Tr. 100.)

### 3.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the March 21, 2018 hearing.[19]  (Tr. 105-12.)  The ALJ informed the VE that there was no past relevant work.  (Tr. 105.)  In response to the ALJ's second hypothetical question (Tr. 105-07) which mirrored the RFC assessed by the ALJ for the period between August 15, 2006, the alleged onset date, and December 31, 2016 (Tr. 30), the VE testified that the following unskilled (SVP 2), medium level jobs would be available: janitor, dishwasher, and warehouse worker.  (Tr. 106, 107.)  In response to the ALJ's third hypothetical question (Tr. 105-08) which mirrored the ALJ's RFC assessment for the period since January 1, 2017 (Tr. 30),[20] the VE testified that the janitor job would be eliminated, but the jobs of dishwasher and warehouse worker would remain (Tr. 108).  He also said that the job of hand packager would be available.  (*Id*.)

In response to additional questioning by the ALJ, the VE testified that full-time competitive employment would not be available if an individual were to act inappropriately with others at work on a weekly basis, in a way that resulted in the individual being removed the premises.  (Tr. 108-09.)  If an individual had a verbal altercation with a coworker after a training period, the VE said that the individual might receive one warning before being terminated.  (Tr.

---

[19] Vocational experts also testified at the hearings in 2011 (Tr. 198-204) and 2014 (Tr. 157-65).  At the 2014 hearing, the vocational expert testified that if an individual could only rarely—which would be less than occasionally—interact with coworkers and supervisors, she could not engage in competitive work. (Tr. 159-60.)

[20] The RFC assessments by the ALJ for the two periods differed only in that the RFC assessment for the period since January 1, 2017, further restricted Ms. Montanez to work where she would not have to use chemicals such as bleach and pine sol.  (Tr. 30.)

109.)  However, the individual would likely be terminated if a verbal or physical altercation occurred while the individual was in the initial training period or, if a physical altercation occurred after the initial training period.  (*Id*.)

The VE testified that an individual could generally not be off task more than 15% of the time in an unskilled job, excluding regularly scheduled work breaks, in order to maintain competitive full-time employment.  (Tr. 110-11.)  The VE clarified that the jobs that he identified earlier in his testimony were not "production line rate" jobs that had variable rates of production throughout the day, but there would be "end of the day expectations," i.e., where the employee would need to get assigned work done by the end of the day.  (Tr. 111-12.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

58

3.      If the claimant is not doing substantial gainful activity, is suffering from a
        severe impairment that has lasted or is expected to last for a continuous
        period of at least twelve months, and his impairment meets or equals a listed
        impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must
        assess the claimant's residual functional capacity and use it to determine if
        the claimant's impairment prevents him from doing past relevant work.  If
        the claimant's impairment does not prevent him from doing his past relevant
        work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if,
        based on his vocational factors and residual functional capacity, he is
        capable of performing other work that exists in significant numbers in the
        national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.      The ALJ's Decision

In her January 16, 2019 decision, the ALJ made the following findings:[21]

1.      The claimant has not engaged in substantial gainful activity at any time
        since August 15, 2006, the alleged onset date, and when she was 40 years
        old.  (Tr. 17.)

2.      The claimant has the following severe mental impairments since her
        alleged onset date of August 15, 2006: affective disorders and anxiety-
        related disorders.  (Tr. 17-27.)

3.      The claimant has not had an impairment at any time since the August 15,
        2006 alleged onset date that has met or medically equaled the severity of

---

[21] The ALJ's findings are summarized.  Since Ms. Montanez's physical impairments are not at issue in this appeal,
the within summary of the ALJ's decision does not include physical impairments and/or physical RFC limitations.

any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 27-29.)

4.      Between August 15, 2006, the alleged onset date, and December 31, 2016, the claimant had the following mental residual functional capacity: While she could not carryout detailed instructions, she could understand, remember, and carryout simple instructions. She could also concentrate, persist, and pace herself in terms of being able to perform routine type tasks in jobs that do not involve productions demands in terms of time or quantity. While the claimant could not work in jobs where she would have to interact with members of the public, she could work in jobs where she would have to occasionally interact with co-workers and supervisors as long as such interactions were limited to speaking/signaling as needed to take instructions and carry out instructions. The claimant was further limited in that she could not work in jobs where she would have to engage in conflict resolution or direct the work of others.  (Tr. 30-65.)

5.      Since January 1, 2017, the claimant had the same mental residual functional capacity as set forth in Finding 4.[22] (*Id*.)

6.      The claimant was 52 years old at the time of the decision and 40 years old on the alleged onset date of August 15, 2006, making her an individual in the "18 to 49" age group from her alleged onset date until she turned 50 years of age in 2016, at which time she became a person closely approaching advanced age. (Tr. 65.)

7.      The claimant has a limited education with the ability to communicate in English. (Tr. 65.)

8.      Transferability of job skills is not material to the determination of disability because claimant has no past relevant work.  (*Id*.)

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant has been able to perform since the August 15, 2006 alleged onset date, including janitor, dishwasher, warehouse worker, and hand packer.  office helper, stock checker, and mail clerk. (Tr. 65-66.)

Based on the foregoing, the ALJ determined that Ms. Montanez had not been under a

disability since the August 15, 2006 alleged onset date.  (Tr. 66.)

---

[22] The only difference in the residual functional capacities for the two periods identified relates to Ms. Montanez's physical residual functional capacity.

### V.        Plaintiff's Argument

In her sole assignment of error, Plaintiff argues that the ALJ erred in her evaluation of the treating psychiatrist opinions.  (ECF Doc. 18, pp. 1, 15-25; ECF Doc. 23.)

### VI.       Law & Analysis

**A.        Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached

by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit

has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651

(6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not

be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio

2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Sole Assignment of Error: Whether ALJ Erred in Evaluating Treating Psychiatrist Opinions**

**1.      Governing Legal Standards**

Ms. Montanez filed her application for SSI on October 23, 2009.  (Tr. 205.)  Since her

claim was filed before March 27, 2017, the prior rules for evaluating opinion evidence apply.

Those regulations provide that every medical opinion will be evaluated, no matter its source, *see*

20 C.F.R. § 416.927(c), but there is a hierarchy for evaluating medical opinions in which the

well-supported opinion of a treating physician is entitled to controlling weight, *see* 20 C.F.R. §

416.927(c)(2), and the opinion of an examining but non-treating medical source is given more

weight than a non-examining medical source, *see* 20 C.F.R. § 416.927(c)(1).

The Sixth Circuit provided detailed instructions regarding the weight to be given the

opinion of a treating source under the prior regulations:

> Treating-source opinions must be given "controlling weight" if two conditions are
> met: (1) the opinion "is well-supported by medically acceptable clinical and
> laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the
> other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).
>
> If the Commissioner does not give a treating-source opinion controlling weight,
> then the opinion is weighed based on the length, frequency, nature, and extent of
> the treatment relationship, *id*., as well as the treating source's area of specialty and
> the degree to which the opinion is consistent with the record as a whole and is
> supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).
>
> The Commissioner is required to provide "good reasons" for discounting the weight
> given to a treating-source opinion. *Id*. § 404.1527(c)(2). These reasons must be
> "supported by the evidence in the case record, and must be sufficiently specific to
> make clear to any subsequent reviewers the weight the adjudicator gave to the
> treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul.
> No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996). This
> procedural requirement "ensures that the ALJ applies the treating physician rule
> and permits meaningful review of the ALJ's application of the rule." *Wilson v.
> Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004).

*Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 376 (6th Cir. 2013). While ALJ's are required

to consider the factors in 20 C.F.R. § 416.927(c)(2) in deciding what weight to give to treating

source opinions, they are not required to provide a factor-by-factor analysis; their decisions need

only include "good reasons" for the weight assigned. *Francis v. Comm'r Soc. Sec. Admin*., 414

F. App'x 802, 804 (6th Cir. 2011).

When an ALJ does not give a treating source opinion "controlling weight," they should

consider the factors set forth in 20 C.F.R. § 416.927(c)(1)-(6)—examining relationship, treating

relationship, supportability, consistency, specialization, and other factors tending to support or

contradict the medical opinion—when "deciding the weight [to] give to any medical opinion."

*See* 20 C.F.R. § 416.927(c); *see also Beery v. Comm'r of Soc. Sec*., 819 F. App'x 405, 408 (6th

Cir. 2020) ("In evaluating the opinion of an examining but nontreating physician, 'the ALJ

should consider factors including the length and nature of the treatment relationship, the evidence that the physician offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the physician was practicing in her specialty.'") (quoting *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)).

In her sole assignment of error, Ms. Montanez challenges the ALJ's weighing of the opinions of all four of her treating psychiatrists—Drs. Abraham, Gomes, Saini, and Noveske. But she primarily challenges the ALJ's reasons for giving "little weight" to certain opinions by her long-time treating psychiatrist, Dr. Noveske.  The undersigned turns first to that argument.

### 2.    ALJ's Evaluation of Dr. Noveske's Opinion

Ms. Montanez argues that the ALJ failed to provide good reasons for the weight she assigned to the opinion of Dr. Noveske, her long-term treating psychiatrist. (ECF Doc. 18, pp. 15, 20-25; ECF Doc. 23, pp. 2-10.)  In particular, she contends the ALJ failed to consider the whole record, and that the ALJ's stated reasons for assigning "little weight" are flawed and do not constitute "good reasons" as required under the regulations.  (ECF Doc. 18, pp. 21-25; ECF Doc. 23, pp. 4-10.)  The Commissioner responds that the "ALJ's analysis of Dr. Noveske's opinion was characteristic—she recognized he was a treating source (and therefore potentially due controlling weight), but . . . declined to adopt the opinion" (ECF Doc. 22, pp. 8-9)—and asserts that the ALJ's analysis was supported by substantial evidence (*id*. at pp. 13-19).

With respect to Dr. Noveske's opinion, the ALJ acknowledged that Dr. Noveske was a treating source, but declined to assign controlling weight to his opinion because she found it "not well supported and . . . contradicted by other evidence in the file."  (Tr. 62.)  She assigned "some" and "little" weight to Dr. Noveske's opinion for the following reasons:

> First, he completed a pre-printed form with scant narrative explanation to support his use of check marks to express his opinion.  He did not refer to any particular

examples from treatment notes with dates to explain the limits. His narrative explanation was generic and could apply to any one with the same mental health conditions the claimant has. He said the claimant was unable to concentrate, yet did not provide any specific of examples to support the statement. He has not conducted any objective testing, therefore, all of the information he obtained is from the claimant's report. Therefore, this further reduces the persuasiveness of his opinion.

(*Id.*) The ALJ further stated:

> Dr. Noveske said the claimant could consistently understand, remember, and follow simple one-and two-step instructions (see Ex. 46F, p. 2). As this opinion is not inconsistent with the residual functional capacity the undersigned determines the claimant has, she has given some weight to it.

> Dr. Noveske also said the claimant would be "off task" less than 10 percent of an eight-hour work period (see Ex. 46F, p. 2). As this opinion is not inconsistent with the residual functional capacity the undersigned determines the claimant has, she has given some weight to it. On this point, the undersigned notes the vocational expert, Mr. Breen, testified that, based on his experience, employers tolerate unskilled workers being off task up to 10 percent of an eight-hour work period.

> Dr. Noveske also described the claimant as being "seriously limited," without defining what he meant by his use of the word "seriously," in terms of her ability to engage in superficial public interactions (see Ex. 46F, p. 2). As this opinion is not entirely inconsistent with the residual functional capacity the undersigned determines the claimant has, she has given some weight to it.

> Dr. Noveske also described the claimant as being "seriously limited" in terms of her ability to respond to ordinary instructions and criticism from supervisors and in terms of her ability to work around co-workers without causing interpersonal conflicts. (Id.). The undersigned has not given controlling weight to these opinions because the evidence regarding the claimant's ability to interact with others referenced in this decision does not support it. The undersigned has instead placed little weight on this opinion for the following additional reasons:

> • Dr. Noveske's opinions are not consistent with his own records which indicate the claimant has remained "reasonably stable" as he stated in 2015. (Ex. 48F, pgs. 43-50) He sees her once every two months for medication management and she does receive mental health counseling. She routinely sees a case manager whose role and services are different. A case manager is there to help person get resources in the community, fill out paper work to obtain entitlements, including housing and utility payments and can transport the client to appointments.

- Dr. Noveske's opinions are not consistent with the opinions of Dr. Katz, the above-mentioned State agency psychologist who reviewed this record on June 14, 2013 (see Ex. 3A, p. 11).

- Dr. Noveske's opinion is at odds with the opinion of Dr. Semmelman, the above-mentioned State agency psychologist who reviewed this record on August 27, 2013 (see Ex. 5A, pps. 11 and 12).

- Dr. Noveske's opinion is at odds with the opinion of Dr. Goldsmith, the above-mentioned State agency psychologist who reviewed this record on April 5, 2017 (see Ex. I5A, pps. 12 and 13).

- Dr. Noveske's opinion is at odds with the opinion of Ms. Foulk, the above-mentioned State agency psychologist who reviewed this record on May 31, 2017 (see Ex. 17A, pps. 12 and 13).

Dr. Noveske also described the claimant as being unable to manage the stress of day-to-day demands of simple and routine tasks (see Ex. 46F, p. 3). The undersigned has not given controlling weight to this opinion because the evidence regarding the claimant's mental functioning referenced in this decision does not support it. For example, the claimant has lived in an apartment with her boyfriend for the past nine years; she maintains the household, cooks, interacts with her family and friends, has entertained her family and friends at her home, has attended church, maintained a good relationship with her pastor and coordinated a move from one residence to another. The undersigned has instead placed little weight on this opinion for the following additional reasons:

- Dr. Noveske's opinion on the above point is speculative.

- Dr. Noveske's opinion on the above point is not consistent with the opinions of Drs. Waggnoer and Meyer, the above-mentioned State agency psychologists who respectively reviewed this record on March 11, 2010 and August 13, 2010.  More specifically, both of these sources said the claimant had the "ability to perform simple and routine tasks in a static environment with limited social contact."  (see Ex. 7F, p. 3; and 13F).

(Tr. 62-63.)

Plaintiff argues that the ALJ's analysis of Dr. Noveske's opinion is flawed, despite its length, and that her stated reasons for assigning "little weight" to parts of the opinion do not constitute "good reasons" as required by the regulations.  (ECF Doc. 18, pp. 20-25; ECF Doc. 23, pp. 4-10.)  First, she argues that the ALJ did not provide good reasons because she did not

66

discuss the nature and extent of Ms. Montanez's treating relationship with Dr. Noveske, and did not discuss how Dr. Noveske's specialty as psychiatrist factored into her analysis, even though the non-examining sources were psychologists, not psychiatrists.  (ECF Doc. 18, pp. 20-21; ECF Doc. 23, pp. 4-5.)  Second, she argues that the ALJ's stated reasons do not constitute "good reasons" because they are flawed and/or are not based on a consideration of the entirety of the record which, considered as a whole, shows that Ms. Montanez "is only able to function nominally in the community without extensive interventions and support" (ECF Doc. 23, p. 10). (ECF Doc. 18, pp. 21-25; ECF Doc. 23, pp. 5-10.)

The Commissioner asserts that the ALJ was "fully aware of Dr. Noveske's treating status" (ECF Doc. 22, pp. 13, 15-16), and that the length or nature of the treatment relationship did not require the ALJ to adopt Dr. Noveske's opinion because the ALJ found his opinion "not supported or consistent with other evidence" (*id*. at p. 16).  The Commissioner also argues that the ALJ did not overlook evidence or fail to consider the entirety of the evidence when concluding that Dr. Noveske's more disabling limitations were not consistent with his own treatment notes or other evidence of record.  (*Id*. at pp. 16-19.)

"If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, . . . as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. §§ 404.1527(c)(2) and 404.1527(c)(2)-(6)).  While the regulations do not require a factor-by-factor analysis, *Francis*, 414 F. App'x at 804, "[t]he Commissioner is required to provide 'good reasons' for discounting the weight given to a treating-source opinion" *Gayheart*, 710 F.3d at

376 (internal citation omitted).  To constitute "good reasons," the "reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Id.* (internal citation omitted).

The undersigned first addresses Ms. Montanez's contention that the ALJ's failure to specifically discuss each of the regulatory factors in 20 C.F.R. 416.927(c) is itself a basis for remand.  (ECF Doc. 18, p. 20; ECF Doc. 23, p. 5.)  Here, the ALJ identified Dr. Noveske as a treating source (Tr. 62) but did not specifically discuss the length of Ms. Montanez's treatment relationship with Dr. Noveske—six years at the time Dr. Noveske authored his opinion—or his specialty as a psychiatrist.

While the described omissions do not automatically require remand, *see Francis* 414 F. App'x at 804, the ALJ's failure to acknowledge the continuous and long-term treating relationship between Ms. Montanez and Dr. Noveske is troubling, particularly in light of the ALJ's explicit observation that "the medical source opinions in [the] record span nine years and come from a variety of sources, *none of whom has continuously followed the claimant during this span of almost a decade*."  (Tr. 42 (emphasis added).)  While it is true that Ms. Montanez did not continuously receive medication management services from one psychiatric provider over that entire period, she did treat regularly and exclusively with psychiatric providers at the Nord Center since 2009, and treated continuously with Dr. Noveske from March 2012 through the March 2018 hearing date.  *See* Sections II.B.1 & II.C.2 *supra*.  By emphasizing the lack of a single medical opinion to account for Mr. Montanez's psychiatric treatment from 2009 to 2018, without acknowledging that Dr. Noveske's opinion addressed her continuous treatment since 2012, the ALJ failed to account for important evidence relevant to her analysis of the weight

given to Dr. Noveske's opinion. This failure is made more concerning by: the ALJ's additional failure to acknowledge that all four of the treating source statements originated from a single facility where Ms. Montanez had treated since 2009; the ALJ's emphasis—in discussing the three other Nord Center treating source opinions—on the relatively short term of Ms. Montanez's treating relationship with those providers (*see* Tr. 45 (one visit), Tr. 50-53 (short period), and Tr. 54 (four months)); and the ALJ's alternate emphasis on the greater weight given to the medical opinions of the non-examining state agency psychologists (*see* Tr. 62-63).

Notwithstanding the noted omissions, the ultimate question before this Court is whether the ALJ provided "good reasons" supported by substantial evidence for the weight assigned to Dr. Noveske's opinion. (Tr. 62.) The ALJ initially provided general reasons for discounting Dr. Noveske's opinion. She then provided additional reasons for why "some" or only "little" weight was provided to certain opinions.[23] (Tr. 62-63.) The undersigned turns first to the ALJ's more generally stated reasons for discounting Dr. Noveske's opinion and then to the additional reasons the ALJ provided for assigning "little weight" to portions of Dr. Noveske's opinion.

### i. Pre-Printed Form with "Scant" / "Generic" Narrative Explanation

The ALJ first discounts Dr. Noveske's opinion because it was completed using a "pre-printed form" and contained "scant narrative explanation to support his use of check marks to express his opinion." (Tr. 62.) In addition to finding Dr. Noveske's narrative explanation "scant," she discounted the opinion because the "narrative explanation was generic and could

---

[23] The ALJ explained that she provided "some weight" to Dr. Noveske's opinions that Ms. Montanez "could consistently understand, remember, and follow simple one- and two-step instructions" and "would be 'off task' less than 10 percent of an eight-hour work period" because those opinions were "not inconsistent with the residual functional capacity" adopted by the ALJ. (Tr. 62.) She also gave "some weight" to Dr. Noveske's opinion that Ms. Montanez would be "'seriously limited' . . . in terms of her ability to engage in superficial public interactions," noting that, although the word "seriously" was undefined by Dr. Noveske, the opinion was "not entirely inconsistent with the residual functional capacity" adopted by the ALJ. (*Id.*) Although Plaintiff disagrees with the ALJ's finding that the term "seriously" was not defined by Dr. Noveske (ECF Doc. 18, p. 21), the ALJ's assignment of "some weight" to these specific opinions is not directly at issue in this appeal.

apply to any one with the same mental health conditions the claimant has." (*Id*.)  Dr. Noveske's

hand-written narrative explanation stated the following:

> Ms. Montanez has periods of stability, however, they are not consistent or
> sustained. When [symptoms] arise, she becomes hostile, manic, aggressive, socially
> & inappropriate. She is unable to maintain boundaries, uses poor judgment, has
> mood swings, is unable to concentrate, requires constant redirection, is unable to
> remember tasks, lacks ability to problem solve, difficulty dealing with stressful
> situations, has delusional thoughts, paranoid & lacks impulse control. Some
> [symptoms] are present with stability, however, appear less extreme during these
> periods.

(Tr. 2530.)  When asked whether the specified limitations lasted or were likely to last for at least

12 months, further hand-written notes report that Ms. Montanez "has periods of stability,

however, they are not consistent."  (*Id.*)

The undersigned finds that the above-stated reasons do not constitute "good reasons."

While Dr. Noveske's opinion was completed using a pre-printed form, the record does not

support a finding that his narrative explanation was "scant" or "generic."  (Tr. 2529-30.)  He

specifically addressed the extent, consistency, stability, and nature of Ms. Montanez's symptoms,

and identified some of the functional impacts of those symptoms during periods of instability.

(Tr. 2530.)  He did not offer a generic opinion as to what symptoms or behaviors an individual

with Ms. Montanez's conditions might exhibit.  Instead, his narrative specifically addressed Ms.

Montanez's own mental health symptoms and history, based on a six-year treating relationship,

which was consistent with the Nord Center records from that time-period.  (Tr. 2529-30.)  The

undersigned therefore finds that Dr. Noveske's use of a pre-printed form with the above narrative

did not provide "good reasons" for the limited weight assigned to Dr. Noveske's opinion.

### ii.     Failure to Identify Examples from Treatment Notes

The ALJ next discounted Dr. Noveske's opinion because Dr. Noveske "did not refer to

any particular examples from treatment notes with dates to explain the limits," and "said the

claimant was unable to concentrate, yet did not provide any specific of examples to support the statement." (Tr. 62.) Supportability is an appropriate factor to consider when weighing opinion evidence. *See* 20 C.F.R. § 416.927(c)(3), but it is not the sole factor. Further, as discussed above, Dr. Noveske provided a narrative explanation to support his opinions—acknowledging Ms. Montanez's periods of stability, but explaining that they were not consistent or sustained, and describing the symptoms and functional limitations associated with her manic periods. (Tr. 2530.) That narrative explanation was consistent with medical records during the treatment period, which documented periods of psychiatric instability and manic behavior that resulted in crisis intervention in April 2012 (Tr. 1810-11), crisis assessment and involuntary commitment in June 2012 (Tr. 1730-34, 1798-1803), crisis assessment and hospitalization in May 2014 (Tr. 1712-15), involuntary hospitalization in July 2014 (Tr. 1705-10), crisis assessment in August 2016 (Tr. 2340-45), and hospital admission for a manic relapse in September 2016 (Tr. 1822-27).

Given that Dr. Noveske provided a narrative explanation in support of his opinion—a narrative that was consistent with the medical records, but which the ALJ failed to specifically discuss or accurately characterize in her own analysis of the opinion—the undersigned finds Dr. Noveske's failure to also identify specific "examples" from his treatment notes to support the opinion did not provide "good reasons" for the limited weight the ALJ assigned to his opinion.

### iii. Lack of Objective Testing / All Information from Plaintiff's Report

The ALJ also discounted Dr. Noveske's opinion because he had "not conducted any objective testing, therefore, all of the information he obtained is from the claimant's report." (Tr. 62.) The Commissioner argues that this stated reason is supported by the record because Dr. Noveske's treatment notes contain blanks sections "where one would have expected more detailed objective reporting regarding her symptoms." (ECF Doc. 22, p. 14.) The ALJ and the Commissioner appear to contend that "all of the information" Dr. Noveske relied upon in support

71

of his medical opinions was limited to Ms. Montanez's subjective reports because the treatment notes do not include clinical or other objective findings.  This assertion goes farther than the record will support, and does not provide "good reasons" to support the limited weight given to the opinion.

It is unclear what exactly the ALJ means when she says Dr. Noveske did not conduct "objective testing," but it is evident that his treatment records do include clinical mental status findings.  (*See, e.g.,* Tr. 1589 (stable, bright affect, no vegetative symptoms, no abnormal movements); Tr. 1672 (anxiety, rapid speech, racing thoughts).)  But regardless, even a lack of clinical findings in the psychiatric treatment notes would not—in the context of the record as a whole—support a broader conclusion that "all of the information" Dr. Noveske considered in support of his opinions was limited to "the claimant's report."  (Tr. 62.)  Such a conclusion would necessarily disregard the fact that Dr. Noveske was a specialist in psychiatry who regularly observed Mr. Montanez's behavior during six years of psychiatric treatment visits.  It would also disregard the fact that Dr. Noveske was a treating psychiatric provider at the Nord Center, where Ms. Montanez also underwent numerous crisis assessments and received extensive CPST case management services; both the crisis assessment and CPST records documented abnormal clinical findings.  (*See, e.g.,* Tr. 1661 (April 2014 CPST); Tr. 1798-1803 (June 2012 crisis assessment).).  Finally, this assertion would disregard the fact that Ms. Montanez's office visits with Dr. Noveske included follow up visits to address recent psychiatric hospitalizations.  (*See, e.g.,* Tr. 1743-44 (office visit where "primary focus" was recent hospital admission).)  The undersigned therefore finds that the absence of undefined "objective testing" in Dr. Noveske's records fails to demonstrate that his opinions were based only on Ms. Montanez's self-report, and thus not provide "good reasons" for the limited weight assigned to Dr. Noveske's opinion.

72

### iv.      Treatment Records Showing Periods of Stability

As to Dr. Noveske's opinion that Ms. Montanez would be "'seriously limited' in her ability to respond to ordinary instructions and criticism from supervisors or to work around co-workers without causing interpersonal conflict, the ALJ explained that she did not afford that opinion controlling weight because "the evidence regarding claimant's ability to interact with others referenced in this decision does not support it."  (Tr. 62-63.)  She explained further that she gave "little weight" to the opinion because it was "not consistent with [Dr. Noveske's] own records which indicate the claimant has remained 'reasonably stable' as he stated in 2015."  (Tr. 63 (citing Tr. 2373-80 (3/12/15, 6/8/15, 10/26/15, & 5/12/17 treatment visits).)[24]  In further support, the ALJ noted that Dr. Noveske saw Ms. Montanez every two months for medication management, while she also received mental health counseling and had a case manager who was there to help her "get resources in the community, fill out paper work to obtain entitlements, including housing and utility payments[,] and can transport the client to appointments."  (Tr. 63.)  The undersigned finds that these stated reasons for giving little weight to Dr. Noveske's opinions do not amount to "good reasons" to support the ALJ's findings.

First, when the ALJ characterized Dr. Noveske's treatment records as indicating Ms. Montanez "has remained 'reasonably stable,'" as noted in some 2015 records, the ALJ failed to accurately account for the longitudinal records during the entire six-year treating relationship, which demonstrated numerous significant periods of instability, including manic episodes resulting in a crisis intervention and hospitalization in 2012, a crisis intervention and two hospitalizations in 2014, and a crisis assessment and hospitalization in 2016.  *See* Section II.B.1., *supra*.  This failing in the ALJ's analysis is compounded by her additional failure, as discussed

---

[24] The ALJ cited to "Ex. 48F, pgs. 43-50," which is not in the treatment record.  But the context of the citation suggests the ALJ intended to cite to Exhibit 43, pages 43-50, which is the transcript citation provided above.

above, to otherwise acknowledge the significant length of the six-year treating relationship

between Dr. Noveske and Ms. Montanez in the context of weighing Dr. Noveske's opinion.

The Commissioner argues the ALJ did not overlook evidence of Ms. Montanez's

hospitalizations or interpersonal conflict because she had previously acknowledged the

hospitalizations earlier in her decision.  (ECF Doc. 22, p. 17 (citing Tr. 40).)  The ALJ did

generally acknowledge Ms. Montanez's 2012, 2014, and 2016 hospitalizations, but did not find

them supportive of disabling limitations because "the events preceding these hospitalizations

included problems the claimant had following prescribed treatment," and because Ms.

Montanez's "mental functioning improved significantly, and stayed improved, following these

hospitalizations."  (Tr. 40.)  The ALJ does not cite to specific records or findings that

substantiate her generalized suggestion that all of the hospitalizations resulted from "problems"

Ms. Montanez had with following her prescribed treatment, or that she "stayed improved"

following her hospitalizations.  The medical records summarized in Section II.B.1., *supra*, do not

clearly suggest a black and white correlation between Ms. Montanez's medication compliance

and her hospitalizations.  (*See, e.g.,* Tr. 1714-15.)  Further, the Sixth Circuit has noted that non-

compliance with prescribed treatment can be "another symptom of the disorder itself."  *See*

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) (citing *See Pate–Fires v. Astrue,*

564 F.3d 935, 945 (8th Cir. 2009)).  Such a finding would be consistent with the opinion of one

of Ms. Montanez's other treating psychiatrists—Dr. Gomes—who opined in 2011 that Ms.

Montanez did not take her medication "as prescribed due to her paranoid delusion."[25]  (Tr.

---

[25] The ALJ rejected this opinion, finding it "conclusory" and without "reference to treatment notes or dates where she presented with an alleged paranoid delusion which was the sole contributing factor to her failure to take prescribed medication."  (Tr. 48.)  But Dr. Gomes's treatment records are consistent with both paranoid delusions and medication noncompliance.  (*See, e.g.,* Tr. 1177-78.)  The ALJ did not identify or discuss specific evidence that undermined Dr. Gomes's conclusion that Ms. Montanez's medication noncompliance was associated with the symptoms of her mental impairments.

2605.)  And the ALJ's finding that Ms. Montanez "stayed improved" following her hospitalizations is undermined by the fact that she was hospitalized on a recurrent basis.

It bears some emphasis that the periods of stability and decompensation evident in the treatment records for the six-year period when Ms. Montanez was treating with Dr. Noveske are consistent with Dr. Noveske's narrative observation, discussed above, that she "has periods of stability, however, they are not consistent or sustained."  (Tr. 2530.)  The ALJ's problematic failure to acknowledge and address that narrative finding in her analysis is compounded by her inaccurate characterization of Dr. Noveske's records as "indicat[ing] the claimant has remained 'relatively stable,'" without acknowledging and addressing those of Dr. Noveske's records that clearly demonstrate periods of significant instability resulting in hospitalization.

The evidentiary record also does not support the ALJ's limited characterization of the community psychiatric supportive treatment ("CPST") Ms. Montanez received at the Nord Center.  The CPST records summarized at length in Section II.B.1., *supra,* indicate that Ms. Montanez's case managers not only assisted her with paperwork and transportation, but also provided supportive treatment targeting her psychiatric symptoms and associated functional limitations.  (*See, e.g.,* Tr. 1653-54 (attempting to de-escalate situation involving police, resulting in request for a crisis assessment); Tr. 1753 (accompanying client on community outing to address impulsive behavior, lack of social boundaries, and to provide constant redirection); Tr. 1761-62 (facilitating ISP, reviewing treatment goals, and redirecting client multiple times to accomplish task)).  The record reflects that Ms. Montanez received case management services at least once a month during periods of stability (Tr. 97, 99; *see also* Section II. B.1 *supra*), and on a much more frequent basis when her symptoms escalated, including "every week to every day" (Tr. 97; *see also* Tr. 99, Section II.B.1 *supra*).

The ALJ's reliance on a snapshot of records from 2015 showing Ms. Montanez was "reasonably stable" as a basis for discounting an opinion based on a six year treating relationship falls short of supplying a "good reason" to give little weight, especially where the complete record demonstrates repeated periods of instability and decompensation throughout the period at issue and the ALJ did not adequately consider whether any non-compliance associated with those periods of instability was itself a symptom of the underlying mental impairments.

### v.    Independent Functioning and Activities of Daily Living

As to Dr. Noveske's opinion that Ms. Montanez would be "unable to manage the stress of day-to-day demands of simple and routine tasks," the ALJ explained that she did not apply controlling weight to that opinion because the "evidence regarding the claimant's mental functioning referenced in [the] decision [did] not support it," explaining:

> For example, the claimant has lived in an apartment with her boyfriend for the past nine years; she maintains the household, cooks, interacts with her family and friends, has entertained her family and friends at her home, has attended church, maintained a good relationship with her pastor and coordinated a move from one residence to another.

(Tr. 63.)

As an initial matter, Ms. Montanez's ability to perform some limited activities of daily living does not necessarily equate to an ability to perform such activities on a sustained basis. *See Gayheart*, 710 F.3d at 377-78.  But more concerning in this case, it is evident that the ALJ's characterizations of some of the evidence she cites to support a finding of adequate functional adaptation skills are not wholly accurate.  For instance, the ALJ states that Ms. Montanez "has entertained family and friends at her home."  (*See* Tr. 63; *see also* Tr. 22 ("The claimant has entertained family and friends at her home as reported on August[] 2, 2014[.]") (citing Tr. 1769, 1776).)  But the first record the ALJ cites in support is an August 2014 individual service plan containing the following report of "Client's Current Condition / Functioning":

> Clt currently lives in an apartment through S + C in Lorain, however is being evicted due to ongoing issues with other residents. . . . Clt is able to maintain ADLs independently. Clt often gets into arguments with her neighbors resulting in the police being called. Clt enjoys riding her bike, writing, cooking and spending time with her family.

(Tr. 1769 (emphasis added).)  The second record relates a July 2014 CPST session where Ms. Montanez reported having friends over to her home for a cook out on Memorial day, but explained that "drama" with her neighbor caused her friends to leave, and that her yelling at her friends for leaving then caused her neighbor to call the police and claim that Ms. Montanez was threatening her, which ultimately resulted in a restraining order being entered against Ms. Montanez.  (Tr. 1776.)  These records do not suggest that Ms. Montanez's level of mental functioning while entertaining family and friends contradicts Dr. Noveske's opinion that she is unable to handle the stress of the day-to-day demands of completing simple routine tasks.

The ALJ also asserts, without supporting citations, that Ms. Montanez was able to coordinate a move from one residence to another.  (Tr. 63.)  Due to the lack of supporting citations, it is not entirely clear what situation the ALJ is referencing.  But the CPST records indicate that Ms. Montanez's case manager assisted her with securing a new lease on August 2014, at which time the case manager had to redirect Ms. Montanez several times to complete the task of viewing the home for rent and signing the lease.  (Tr. 1763.)  This record also does not suggest a level of mental functioning while moving residences that undermines Dr. Noveske's opinion that she is unable to handle the stress of the day-to-day demands of completing simple routine tasks.

Given the limited nature of the daily activities described by the ALJ, and the apparent inaccuracy of some of the ALJ's descriptions of the supporting records, the undersigned finds that the ALJ has not stated "good reasons" for assigning little weight to Dr. Noveske's opinion.[26]

### vi.      Contradictory Opinions of Non-Examining State Agency Consultants

Finally, the ALJ assigns "little weight" to Dr. Noveske's opinions that Ms. Montanez would be "'seriously limited' in terms of her ability to respond to ordinary instructions and criticism from supervisors and in terms of her ability to work around co-workers without causing interpersonal conflict" and would be "unable to manage the stress of day-to-day demands of simple and routine tasks" because the opinions were inconsistent with opinions of various state agency psychological consultants.  (Tr. 63.)

Considering the consistency of a medical opinion with other medical opinions in the record is appropriate.  *See* 20 C.F.R. § 416.927(c)(4) (indicating that consistency of a medical opinion with the record as a whole is an appropriate factor to consider when weighing medical opinions).  However, "[n]othing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion." *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009).  Indeed, the Sixth Circuit has explained that "[a] more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Gayheart*, 710 F.3d at 379.  While the ALJ in this case repeatedly emphasized the lack of consistency between Dr. Noveske's psychiatric treating source opinion and the opinions of the non-examining psychological consultants, he does not appear to consider the extent to which Dr.

---

[26] The ALJ also assigned "little weight" to Dr. Noveske's opinion based on a conclusory assertion that the opinion is speculative.  (Tr. 63.)  The undersigned finds that this conclusory assertion does not state a "good reason."

Noveske's opinions were consistent with other opinions of record, including those of the three other psychiatrists who also treated Ms. Montanez at the Nord Center.  (*See e.g.* Tr. 1129 (Dr. Abraham); Tr. 1261-62 (Dr. Saini); Tr. 1556 (Dr. Spindler); Tr. 2604 (Dr. Gomes)).

Given the extensive nature of Dr. Noveske's treatment relationship with Ms. Montanez, a longitudinal record which includes multiple instances of decompensation leading to psychiatric hospitalizations, years of CPST provider visits showing periods of instability consistent with Dr. Noveske's opinions, and the consistency of Dr. Noveske's opinion with other psychiatric treating source opinion evidence—and without a more complete and accurate explanation of how Dr. Noveske's opinion is unsupported by and inconsistent with the record as a whole—the undersigned cannot conclude that the ALJ's stated reasons for assigning little weight to Dr. Noveske's opinion constitute "good reasons" as contemplated under the regulations.

For the reasons set forth above, the undersigned concludes that remand is warranted to allow further consideration of the evidence and a more complete and accurate explanation of the reasons supporting the weight assigned to Dr. Noveske's opinion.[27]

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **VACATE AND REMAND** the Commissioner's decision for further proceedings consistent with this Report and Recommendation.  On remand, the ALJ should consider all evidence of record and provide a clear and accurate explanation for any findings regarding the weight given to the medical opinion evidence, in particular the treating source opinion of F. Gregory Noveske, M.D.  The ALJ should set forth "good reasons" for not giving controlling weight to any treating source opinions, and

---

[27] Ms. Montanez also argues more generally that the ALJ erred in her evaluation of the other treating source opinions.  (ECF Doc. 18, pp. 15-25.)  On remand, the ALJ should also clearly articulate the reasons for the weight assigned to the other treating source medical opinions of record.

those good reasons should both appropriately account for and accurately characterize the relevant

medical records and other evidence.


September 30, 2024


/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge


## **<u>OBJECTIONS</u>**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).